**Tommy LARSEN; Tommy Larsen ApS, Plaintiffs–Appellees,**

v.

**TERK TECHNOLOGIES CORPORATION, Defendant–Appellant.**

No. 97–1032.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1998.

Decided July 14, 1998.

**ARGUED:** George A. Somerville, Mays & Valentine, Richmond, Virginia, for Appellant. Marsha G. Gentner, Jacobson, Price, Holman & Stern, P.L.L.C., Washington, DC, for Appellees. **ON BRIEF:** Frank J. Franzino, Jr., Stephen M. Rosenberg, Davida S. Scher, Franzino & Rosenberg, P.C., New York City, for Appellant. Andrew J. Gray, IV, Jacobson, Price, Holman & Stern, P.L.L.C., Washington, DC, for Appellees.

Before HAMILTON and MOTZ, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judge MOTZ and Senior Judge WILLIAMS joined.

## OPINION

HAMILTON, Circuit Judge:

This action involves a case of "passing off," actionable under the Lanham Act, 15 U.S.C. §§ 1051–1127, and Maryland law. Appellees Tommy Larsen, a Danish citizen, and Tommy Larsen AS, a Danish corporation (collectively Larsen), filed suit against Appellant Terk Technologies Corp. (Terk), alleging that Terk sold counterfeit copies of Larsen's designer compact disc (CD) holder under Larsen's trade name, trademark and logo, and falsely designated it as a product of Denmark. The district court held that Terk intentionally, willfully, knowingly, surreptitiously and fraudulently passed off counterfeit goods of inferior quality as Larsen's authentic Danish-made goods, and awarded Larsen treble damages in the amount of $217,779.78. We affirm.

### I

Tommy Larsen is a designer of products of functional art, useful products designed to be aesthetically and artistically appealing in form and appearance. Tommy Larsen manufactures and distributes his products through Tommy Larsen AS.[1] Terk is a small, privately held New York corporation that produces and distributes upscale consumer electronics equipment.

In 1992, Larsen designed and began distributing a decorative CD holder which Larsen called the "CD 25." (J.A. 78). The CD 25 is made from a single piece of solid steel tubing, bent and curved sinuously into an elegant storage unit that holds 25 CD cases. The CD 25 is sculptural in feel, and available in black or chrome finish. The base of the unit is covered with high-quality rubber tubing that neither slips nor leaves marks on furniture surfaces. The district court noted that it is immediately apparent the CD 25 is a high-quality product.

After introducing the product in Europe, Larsen desired to export the CD 25 to the

---

1. When this lawsuit was filed, Tommy Larsen AS was a Danish entity referred to by the denomination "ApS." After the suit was filed, however, the corporation changed its status under Danish law and is now referred to by the denomination "AS."

United States. To accomplish this, Larsen sought the aid of Marna Christensen, the Vice Consul for Trade in the Royal Danish Consulate General in Chicago. Individually and together, Larsen and Christensen contacted and met with buyers for retailers such as the New York Museum of Modern Art (MOMA), Hammacher Schlemmer, Bang & Olufsen, and Sony. As a result of these efforts, Larsen succeeded in shipping and selling CD 25s in the United States. In these early sales, Larsen shipped the CD 25s in a packaging "sleeve" that bore the TOMMY LARSEN name and logo, and identified the product as a "Design of Denmark." (J.A. 398; *see also* Appellee's Br. at 40). ·

In addition to these direct marketing efforts, Larsen desired to find a suitable distributor that would market and promote the CD 25 in the United States. In August 1993, Neil Terk, the Chief Executive Officer of Terk Technologies, approached Tommy Larsen at a trade show in Berlin about distributing the CD 25 in the United States. Over the next several weeks, Larsen and Terk engaged in negotiations regarding a distribution arrangement for the product. During these negotiations, Larsen suggested an exclusive distributorship, but Terk rejected the idea because it was unwilling to commit to the minimum sales levels Larsen required for such an arrangement. Terk, on the other hand, proposed manufacturing the CD 25 in New York or the Far East. Larsen rejected this proposal, desiring to keep the CD 25 a Danish product. The discussions culminated in November 1993 when Terk placed its first—*and only*—order for 11,232 CD 25s. At Terk's request, and to assist Terk in quickly entering and building a U.S. market, Larsen agreed to reduce its price by $1.00 per unit for this initial shipment.

To reduce Terk's costs, Larsen agreed to allow Terk to develop a "gift box" in which to distribute the CD 25s. Terk produced such a box, which included the TOMMY LARSEN name and logo, the name "CD 25," and the phrases "Made in Denmark" and "Design of Denmark" several places on the top and sides of the box. (J.A. 41–42, 396–97).

Terk distributed the CD 25 for sale in upscale electronics, housewares and department stores such as Neiman Marcus, Bang & Olufsen, Bed Bath and Beyond, and Sony retail stores. Terk also sold the CD 25 through mail-order catalogs for high-quality products and objects of applied art such as *Attitudes* and the MOMA mail order catalogs. In its marketing efforts, press releases, catalogs, advertising and trade show materials, Terk identified and promoted the product as the CD 25, a TOMMY LARSEN product, a TOMMY LARSEN design, a Danish Design, and made in Denmark. Terk also identified the product as the "TOMMY LARSEN" and/or the CD 25 on Terk's invoices. (J.A. 348). Terk packaged the boxed CD 25s in shipping cartons marked "CD 25" and "TOMMY LARSEN TM Design of Denmark." (J.A. 427–28). These marketing efforts paid off, for Terk's customers began to refer to the product as "the TOMMY LARSEN" and/or the "CD 25." (*See, e.g.,* J.A. 487, 489).

Following Terk's initial order in November 1993, Larsen desired to develop Terk's market for the CD 25 in the United States. When companies in the United States inquired about sales of the product, Larsen referred them to Terk. Moreover, Larsen suspended its direct-sales efforts to retailers such as MOMA and Bang & Olufsen, allowing Terk to distribute the product to these companies. However, despite having what appears to have been a *de facto* exclusive distributorship in the United States, Terk placed no additional orders for CD 25s over the ensuing eighteen months. During this time, Larsen communicated with Terk—even traveling to New York—to determine why Terk was not ordering additional units. During one visit to New York in the Spring of 1994, Terk again raised, and Larsen rejected, the possibility of manufacturing the CD 25 in New York.

Despite Larsen's efforts to obtain another order, Terk continuously gave excuses for not ordering additional units. For example, in a letter dated September 22, 1994, Neil Terk wrote Larsen:

> At the present rate of sales, we cannot justify placing another order at this time. In fact, it appears as if it would not be until after the new year. We are presently

trying to move out the balance of our inventory between now and the end of the year.... Neither you nor I have been able to make alot [sic] of money from [selling CD 25s], but the friendship keeps it worth pursuing these business opportunities.

(J.A. 412). That letter also indicated that Terk had been sitting on a large inventory of CD 25s for a long time. However, what Terk did not tell Larsen was that Terk had in reality nearly sold out of CD 25s and had received numerous orders for substantial Christmas deliveries. In fact, at that time TJ Maxx Corporation wanted to buy 7,000 CD 25s from Terk, and Larsen could have delivered them had Terk placed the order. The district court made an explicit finding that Terk's failure to place that order constituted a clear lost sales opportunity for Larsen. It turns out that Terk did not need to order units from Larsen because Terk had arranged to have counterfeit CD 25s manufactured by a local company.

In August 1994, Terk had approached Allen Machine Products (Allen), a manufacturer in New York State, about producing counterfeit CD 25s. After comparing the costs of distributing the Allen-made units versus the genuine Larsen products, Terk, without permission from Larsen, placed an order with Allen on September 8, 1994, for the manufacture and delivery of approximately 11,000 counterfeit CD 25s. Allen did manufacture, and Terk took delivery of, these counterfeit units. The district court found that these counterfeit CD 25s were inferior in quality and materials to the Larsen product. For example, they did not have the clean, sharp lines characteristic of Danish Design, and a CD case would not fit in the counterfeit units unless forced. Furthermore, the rubber tubing on the base was loose enough to slip off, and was shown to leave black marks on furniture surfaces.

Terk packaged the counterfeit units in the same gift box Terk had designed for Larsen's products, bearing the "CD 25" and TOMMY LARSEN names, Larsen's logo, and designated a "Design of Denmark" and "Made in Denmark." (J.A. 41–42, 396–97). In its marketing efforts, Terk referred to the Allen-made units as "the TOMMY LARSEN" and the "CD 25." (*See, e.g.,* J.A. 232–35). Moreover, despite being manufactured in New York, Terk promoted the products as Danish design and made in Denmark. In response to purchase orders for "TOMMY LARSEN CD 25s," Terk delivered and sold the counterfeit units. In a colloquy with the district court, Neil Terk admitted to selling counterfeit Larsen products:

> THE COURT: Now, you were selling products that were produced by Allen instead of Tommy Larsen, right?
>
> THE WITNESS: That is correct.
>
> THE COURT: Why were you doing that?
>
> THE WITNESS: I—
>
> THE COURT: Didn't you think you were misleading customers if you were not giving them the Larsen product?
>
> THE WITNESS: We had really looked at it as if we were giving them the CD 25.
>
> THE COURT: But they weren't really getting a Larsen product, were they?
>
> THE WITNESS: No, sir.
>
> THE COURT: And you didn't tell Larsen that, did you?
>
> THE WITNESS: No, sir.

(J.A. 239b–40).

When Allen experienced delays in delivering additional orders of counterfeit units, Terk contacted Larsen in February 1995 about purchasing additional (genuine) CD 25s. By this time, Larsen had grown suspicious about Terk's actions. Consequently, Larsen asked Vice Consul Christensen to purchase samples of CD 25s at retail. Christensen testified she purchased CD 25s from Bang & Olufsen, Sony and MOMA, and forwarded them to Larsen. It was readily apparent to both Christensen and Larsen that the CD 25s she bought were not produced by Larsen. When Terk's second order for CD 25s arrived in approximately May 1995, Larsen informed Terk it had discovered Terk's fraud and refused to supply Terk with additional units. Amazingly, Terk continued to take orders for TOMMY LARSEN CD 25s, and fill those orders with counterfeit CD 25s, for at least six months after Larsen filed this lawsuit.

Larsen filed suit on June 14, 1995, in the United States District Court for the District of Maryland. Larsen alleged that Terk's actions constituted trade name and trademark infringement, false representation and designation of origin, false and misleading representations, false advertising, unfair and deceptive trade practices, trade disparagement, passing off and unfair competition in violation of § 43(a) of the Lanham Act and Maryland law. Terk counterclaimed for breach of contract.

The district court held a bench trial on November 19–20, 1996. At the conclusion of all the evidence, the district court ruled from the bench that Terk had intentionally, willfully, knowingly, surreptitiously and fraudulently passed off counterfeit goods of inferior quality as Larsen's authentic, Danish-made goods in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[2] Pursuant to § 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), the district court calculated Larsen's lost profits due to Terk's passing off to be $61,361.26. Finding this to be an exceptional case under the Lanham Act, the district court awarded Larsen treble damages in the amount of $217,779.78, plus costs and attorneys' fees.[3] The district court then enjoined Terk from using Larsen's trademark, trade name, or logo, or falsely using the designation "Made in Denmark" on any product. Finally, the district court ruled in favor of Larsen on Terk's counterclaims for breach of contract. Judgment was entered on November 27, 1996.

Terk filed a timely notice of appeal on December 20, 1996. On appeal, Terk challenges (1) the district court's conclusion that Terk violated the Lanham Act, and (2) the award and calculation of treble damages in the amount of $217,779.78. Terk does not, however, appeal the district court's ruling in favor of Larsen on Terk's counterclaims.

**2.** In coming to this conclusion, the district court also noted that Terk's actions involved not only passing off, but also trademark infringement and false designation of origin. The district court did not specifically rule on any of Larsen's other allegations, including allegations brought under Maryland law.

II

Terk raises multiple issues on appeal arguing that the district court erred in finding Terk liable for violating § 43(a) of the Lanham Act. Terk's arguments are, however, without merit.

■ On appeal from a bench trial, we may set aside the district court's findings of fact only if they are clearly erroneous. *See* Fed.R.Civ.P. 52(a). In determining whether a finding of fact is clearly erroneous, we must give due regard to the opportunity of the district court to judge the credibility of the witnesses. *See id.* We review the district court's conclusions of law *de novo. See Resolution Trust Corp. v. Maplewood Invs.*, 31 F.3d 1276, 1281 n. 7 (4th Cir.1994).

Section 43(a) of the Lanham Act provides:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). In addition, § 44 extends the protections and remedies of the

**3.** The matter of costs and attorneys' fees was referred to a magistrate judge and appears not yet to have been decided.

Lanham Act to any foreign national whose "country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law." 15 U.S.C. § 1126(b), (g), (h). Larsen is entitled to the protections and remedies of the Lanham Act because Denmark and the United States are both parties to the International Convention for the Protection of Industrial Property of 1883 (the Paris Convention), *opened for signature* Mar. 20, 1883, 25 Stat. 1372, T.S. No. 379, as amended at Stockholm, July 14, 1967, 21 U.S.T. 1583, T.I.A.S. No. 6923. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 29:21, at 29–46, 29–49 (4th ed.1998).

### A

■ Terk first argues that Larsen has no cause of action because Larsen's unregistered trademark, trade name and logo are not entitled to protection under § 43(a) of the Lanham Act. Terk is correct that, to receive protection under § 43(a), a trademark, trade name or the like must be "in use" in commerce. *See Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992); *see also* 15 U.S.C. § 1125(a) ("Any person who ... *uses in commerce* any [mark] ....") (emphasis added). "Use" within the meaning of the Lanham Act is defined as bona fide commercial use in the market in which protection is sought, *see* 15 U.S.C. § 1127 (defining "use in commerce"), and such use must be "deliberate and continuous, not sporadic, casual or transitory." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271–72 (2d Cir.1974). According to Terk, Larsen's marks have never been "in use" in the United States, so they may not receive protection under the Lanham Act. We find this argument to be both brazen and disingenuous.

The district court made explicit findings that Larsen entered the U.S. market and used its marks in 1993 when it sold CD 25s through MOMA, Hammacher Schlemmer, Bang & Olufsen, Sony and other such retailers. Terk points us to no evidence that would indicate these findings were clearly erroneous. Instead, Terk merely argues those sales were too "sporadic" to constitute use under the Lanham Act. (*See* Appellant's Br. at 14). Even if that were true, which we doubt, Terk sold more than 11,000 genuine CD 25s, all properly designated as Larsen products, before Terk started passing off its counterfeit units. Larsen's marks were therefore clearly "in use" through these legitimate sales of Larsen's products.

In response to questioning at oral argument, Terk insisted that Terk's legitimate sales could not constitute "use" under the Lanham Act, because Terk was not Larsen's agent. Terk directed us to no law that would support such a proposition, and we could find none. Indeed, such a rule would defeat the protections of § 43(a) by allowing exclusive distributors to knock-off their suppliers' products at will. Thus we conclude, at a minimum, that Terk's legitimate sales of CD 25s constituted sufficient "use" under § 43(a) of the Lanham Act such that Larsen's marks are entitled to protection.

### B

■ Terk next argues that its manufacture and sales of counterfeit CD 25s does not violate § 43(a) of the Lanham Act because Larsen does not hold a patent on the design. To support this proposition, Terk cites to two pillars of intellectual property law, *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). However, *Sears* and *Compco* hold only that an unpatented item is part of the public domain and may be copied at will; they do *not* stand for the proposition that a party may copy an article in the public domain and then pass off its counterfeit as being the genuine article. *See Sears*, 376 U.S. at 232–33, 84 S.Ct. 784; *Compco*, 376 U.S. at 238, 84 S.Ct. 779. Moreover, as explained below, the federal courts of appeal have widely held that the *Sears–Compco* doctrine is not a defense to a Lanham Act violation.

*Sears* and *Compco* were nearly identical cases decided by the Supreme Court on the

same day. In both cases, the defendants manufactured and sold essentially indistinguishable copies of the plaintiffs' lighting fixtures, and the plaintiffs sued for federal patent infringement and claims of state unfair competition. *See Sears,* 376 U.S. at 226, 84 S.Ct. 784; *Compco,* 376 U.S. at 235, 84 S.Ct. 779. The district courts held the respective patents to be invalid, but found the defendants liable for violations of state unfair competition laws, and the Seventh Circuit affirmed. *See Sears,* 376 U.S. at 226–27, 84 S.Ct. 784; *Compco,* 376 U.S. at 235–36, 84 S.Ct. 779. The Supreme Court reversed, holding that state unfair competition laws which grant what is essentially the equivalent of federal patent protection are preempted by federal patent laws. *See Sears,* 376 U.S. at 231–32, 84 S.Ct. 784; *Compco,* 376 U.S. at 237, 84 S.Ct. 779. The Supreme Court stated:

> Obviously a State could not, consistently with the Supremacy Clause of the Constitution, extend the life of a patent beyond its expiration date or give a patent on an article which lacked the level of invention required for federal patents. To do either would run counter to the policy of Congress of granting patents only to true inventions, and then only for a limited time. Just as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws.

*Sears,* 376 U.S. at 231, 84 S.Ct. 784 (footnote omitted). *See also Compco,* 376 U.S. at 238, 84 S.Ct. 779 (stating that, if the article is not entitled to a patent or other federal statutory protection, then it can be copied at will). However, the Court also emphasized that

> a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive

dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods.

*Sears,* 376 U.S. at 232, 84 S.Ct. 784. *See also Compco,* 376 U.S. at 238, 84 S.Ct. 779 ("A State of course has power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity, deceive the public by palming off their copies as the original.").

Sears and Compco addressed the effect of preemption by federal patent laws on *state* unfair competition laws. It would thus seem that grounding a law suit on a *federal* statute, such as the Lanham Act, would avoid the federal-state preemption problems at issue in *Sears–Compco.* The federal courts of appeals have agreed. *See Keene Corp. v. Paraflex Indus., Inc.,* 653 F.2d 822, 823 n. 1 (3d Cir.1981); *Ives Labs., Inc. v. Darby Drug Co.,* 601 F.2d 631, 642 (2d Cir.1979) (citing *Truck Equip. Serv. Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1214–15 (8th Cir.1976)). Moreover, *Compco* stated that, if the article is not entitled to a patent *or other federal statutory protection,* then it can be copied at will. *See Compco,* 376 U.S. at 238, 84 S.Ct. 779. Several circuits have relied on this statement in holding that *Sears–Compco* does not offer a defense to a Lanham Act violation. *See Kohler Co. v. Moen, Inc.,* 12 F.3d 632, 640 (7th Cir.1993) ("Of course, the Lanham Act falls under the rubric of 'other federal statutory protection,' [as mentioned in *Compco* ]."); *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts,* 944 F.2d 1235, 1241 (6th Cir.1991) ("Thus, [the defendant] cannot copy at will because 'other federal statutory protection,' the Lanham Act, applies.").

We agree. Terk's labeling of his counterfeit CD 25 as a TOMMY LARSEN product, complete with Larsen's logo[4] and "Made in Denmark," created confusion as to the source of the goods in violation of § 43(a) of the Lanham Act. The fact that Larsen had not yet secured a design patent on the CD 25 did

---

4. At oral argument, counsel for Terk denied that Larsen's logo was on the boxes containing counterfeit CD 25s. However, photocopies of the gift box in the record clearly show Larsen's unique logo.

not give Terk free licence to pass off its product as Larsen's.

### C

Terk next argues that no § 43(a) cause of action lies here because there exists no "secondary meaning" in any of Larsen's marks, and thus, those marks are not entitled to protection under the Lanham Act. We disagree.

■ The protection accorded a trademark is directly related to the mark's distinctiveness. *See Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 464 (4th Cir.1996). So-called "fanciful," "arbitrary," and "suggestive" marks are inherently distinctive, and therefore receive the greatest protection against infringement, *see id.* (citing 1 McCarthy § 11.01[1] (3d ed.1995)), while "generic" marks are accorded no protection at all,[5] *see id.* (citing 2 McCarthy § 12.03 (3d ed.1995)). "Descriptive" marks, on the other hand, are accorded protection only if they have acquired a "secondary meaning."[6] *See id.* (citing 1 McCarthy § 11.08 (3d ed.1995)). Secondary meaning is defined as "the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify."[7] *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir.1990). The use of a surname as a mark (such as LARSEN) is considered to be a descriptive mark and generally must develop secondary meaning in order to receive protection. *See id.*

■ According to Terk, Larsen's marks were not in use long enough, and the consuming public did not have enough experience with Larsen's products, for Larsen's marks to develop secondary meaning. Consequently, Terk argues Larsen cannot bring an action to protect those marks. We disagree. In *Osem Food Industries v. Sherwood Foods*, 917 F.2d 161 (4th Cir.1990), we held that evidence of intentional, direct copying establishes a *prima facie* case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue. *See id.* at 163 (quoting *M. Kramer Manufacturing Co. v. Andrews*, 783 F.2d 421, 448 (4th Cir.1986)). In fact, we stated that such evidence not only shifts the burden of persuasion, but acts as a presumption upon which judgment "must issue" in the absence of rebutting proof. *Id.*

Terk retorts that the *Osem Food–Kramer Manufacturing* presumption should not ap-

---

5. In *Sara Lee* we explained:

> Fanciful marks are, in essence, made-up words expressly coined for serving as a trademark. Some examples of fanciful marks are Clorox[(R)], Kodak[(R)], Polaroid[(R)], and Exxon[(R)].
>
> Arbitrary marks are comprised of words in common usage, but, because they do not suggest or describe any quality, ingredient, or characteristic of the goods they serve, are said to have been arbitrarily assigned. Examples include Tea Rose[(R)] flour, Camel[(R)] cigarettes, and Apple[(R)] computers. Though tea rose, camel, and apple are—unlike Clorox[(R)] and Kodak[(R)]—words denoting "real" things, they are similar to fanciful marks in that they neither suggest any mental image of the associated product nor describe it in any way.
>
> Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product. Coppertone[(R)], Orange Crush[(R)], and Playboy[(R)] are good examples of suggestive marks because they conjure images of the associated products. These marks are nevertheless not descriptive; although they are meant to project a favorable or idealistic image with which a prospective user might identify, a person without actual knowledge would have difficulty in ascertaining the nature of the products that the marks represent.
>
> . . .
>
> "Generic" terms are the common name of a product or service itself, and can never be trademarks. Examples of brand names held to be generic terms are Convenient Store retail stores, Dry Ice solid carbon dioxide, Light Beer ale-type beverages, and, in a case where a once-fanciful mark had, over time, been assimilated into the language, Thermos vacuum-insulated bottles.

*Sara Lee*, 81 F.3d at 464 (internal citations and emphasis omitted).

6. Descriptive marks, as the term connotes, merely describe the product's function, use, characteristic, size, or intended purpose. Examples of such descriptive marks include AFTER TAN post-tanning lotion, 5 MINUTE GLUE, KING SIZE men's clothing, and the YELLOW PAGES telephone directory. *See Sara Lee*, 81 F.3d at 464 (citing 1 McCarthy § 11.08 (3d ed.1995)).

7. COCA–COLA[(R)] is the paradigm of a descriptive mark that has acquired a secondary meaning. *See Sara Lee*, 81 F.3d at 464.

ply in this case because those cases were actions for trade dress, not trademark, infringement. Nevertheless, *Kramer Manufacturing* recognized that courts have almost unanimously presumed a likelihood of confusion upon a showing that the defendant intentionally copied the plaintiff's trademark *or trade dress*. *Kramer Manufacturing*, 783 F.2d at 448 n. 24 (citing 2 McCarthy §§ 23:34–:35 (2d ed.1984)). Consequently, *Osem Food–Kramer Manufacturing* applies even to cases, such as that at bar, for trademark infringement. Thus, if Larsen introduced evidence that Terk intentionally and directly used Larsen's marks to accomplish its passing-off, Larsen had a cause of action to remedy that use, and was entitled to a judgment in its favor if Terk failed to rebut the presumption of secondary meaning.

The evidence at trial clearly showed that Terk intentionally copied the CD 25 and used packaging clearly bearing Larsen's marks. Terk frankly admitted as much at trial. With such clear evidence of copying, the district court correctly found that a presumption of secondary meaning arose. Terk's only "evidence" in rebuttal was its argument that Larsen's products were not in the United States market long enough for secondary meaning to arise.[8] However, the evidence showed, and the district court found, that customers asked for the CD 25 by name and by calling it a "TOMMY LARSEN" or a "LARSEN." We therefore hold that the district court correctly found that Terk did not rebut the presumption of secondary meaning.

### D

Finally, Terk argues there could be no false designation of origin because Neil Terk testified he crossed out the phrase "Made in Denmark" on all boxes containing counterfeit CD 25s. However, the testimony Terk refers to was *deposition* testimony Neil Terk gave before trial; Neil Terk did *not* so testify at trial. In any event, Neil Terk's deposition testimony was contradicted by the

trial testimony of Marna Christensen, the Danish consular officer, that the counterfeit CD 25s she purchased came in boxes labeled "Made in Denmark." (*See* J.A. 196–97). On appeal from a bench trial, we must give due regard to the opportunity of the district court to judge the credibility of the witnesses. *See* Fed.R.Civ.P. 52(a). We therefore uphold the district court's conclusion that Terk falsely designated its New York-manufactured products as made in Denmark.

In conclusion, we hold that the district court was correct in finding that Terk intentionally, willfully, knowingly, surreptitiously and fraudulently passed off counterfeit goods of inferior quality as Larsen's authentic Danish-made goods. We now turn to the issue of damages.

### III

The second major issue in this appeal is the award to Larsen of $217,779.78 in treble damages. Terk challenges both the district court's award of treble damages and the court's calculation of those damages. We conclude below that Larsen was entitled to treble damages and, although the district court made some computational errors, the record fully supports an award of treble damages in the amount of $217,779.78.

Section 35(a) of the Lanham Act provides that, when a violation of § 43(a) has been established, the plaintiff shall be entitled to recover (1) the defendant's profits, (2) damages sustained, and (3) costs of the action. *See* 15 U.S.C. § 1117(a). Section 35(b) permits the district court to award treble damages in appropriate circumstances. *See* 15 U.S.C. § 1117(b) ("In assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee...."). Section 35 confers a great deal of discretion on a district court in fashioning a

---

8. Terk also contends there was no secondary meaning because there was no actual confusion. Terk makes the nonsensical argument that, once Terk ran out of genuine Larsen CD 25s, its customers knew they were getting a knock-off. Terk

fails, however, to explain how or why the consuming public would know that a CD 25 in a box with Larsen's trade name, trademark and logo, and marked "Made in Denmark," was in reality a knock-off manufactured in New York.

remedy for Lanham Act violations, and we set aside an award of damages only for an abuse of that discretion. *See Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 917 (Fed.Cir.1984).

█ Terk first argues that Larsen is entitled to no damages because Larsen proved no lost sales. We find this argument to be ludicrous because Terk openly admitted to selling more than 11,000 counterfeit CD 25s at times when Larsen was pressing Terk for orders. At the very least, Larsen lost those sales. Moreover, the district court also found that TJ Maxx wanted to buy 7,000 CD 25s from Terk, and that Larsen could have supplied those units had Terk placed the order with Larsen instead of asking Allen to manufacture them. In sum, the record clearly shows that Larsen lost sales of over 18,000 CD 25s due to Terk's intentional, willful, knowing, surreptitious and fraudulent passing off. The district court found no extenuating circumstances, so it was not an abuse of discretion to award treble damages. *See* 15 U.S.C. § 1117(b) ("In assessing damages under subsection (a) of this section, the court *shall*, unless the court finds extenuating circumstances, enter judgment for [treble damages] . . . .") (emphasis added).

Terk next complains that the district court made computational errors in calculating the measure of damages. While we acknowledge that the district court erroneously calculated Terk's profits, as we demonstrate below, the record more than supports the award of $217,779.78 in treble damages.

As permitted by § 35(a), the district court used Terk's profits as a measure of damages. *See* 15 U.S.C. § 1117(a). However, the district court miscalculated those profits. The district court made the following computation in calculating Terk's gross profits from the sale of counterfeit CD 25 units:

| Terk's Gross Income on sales of counterfeit units: | $114,263.64 |
| Number of counterfeit units sold: | 11,426 [9] |
| Gross income per unit: | $10.00 |
| Terk's costs per unit: | $5.37 |
| Profit per unit: | $4.63 |
| Gross profit from sales of 11,426 counterfeit units: | $52,902.38 |

9. On appeal, Terk now disputes the number of counterfeit CD 25s it sold. Terk alleges that some sales were double-counted, thus increasing the number of counterfeit CD 25s used as the measure of damages. However, Terk's business records introduced as evidence clearly show that he sold at least 11,426 counterfeit units.

(*See* J.A. 358–59). To this point, the district court's calculations were correct. However, the district court then subtracted the $52,902.38 from the $114,263.64 in gross income to get $61,361.26, which the district court mistakenly called "one aspect of profit to Terk," and used this amount as the basis of the damages awarded to Larsen. (J.A. 359). The $61,361.26 was not, however, Terk's profits but Terk's *costs*. This miscalculation resulted in an $8,458.88 error in Larsen's favor.

The district court next added to Larsen's lost profits the $1.00–per–unit discount Larsen had given in good faith to Terk on 11,232 units. Since Terk treated Larsen so treacherously, we cannot say the district court abused its discretion in awarding this amount as lost profits. Then, as allowed by § 35(b), the district court trebled the damages:

| Terk's profit (erroneously calculated): | $61,361.26 |
| Larsen's lost profits on the $1.00–per–unit discount: | $11,232.00 |
| Larsen's total lost profit: | $72,593.26 |
| Trebled damages: | $217,779.78 |

(*See* J.A. 359–60). Thus, if the district court had correctly calculated Terk's profits, the damages would have been:

| Terk's profits (corrected): | $52,902.38 |
| Larsen's lost profits on the $1.00–per–unit discount: | $11,232.00 |
| Larsen's total lost profits: | $64,134.38 |
| Trebled damages: | $192,403.14 |

(*See* J.A. 358–60). Thus, based on lost sales on 11,426 counterfeit units, the district court over-calculated its award to Larsen in the amount of $25,376.64. Nevertheless, as shown below, the record and the district court's findings clearly support an award of damages in the amount of $217,779.78.

The district court appears to have overlooked its finding that Larsen lost sales of 7,000 units to TJ Maxx. If the district court had properly included these lost sales in its calculations, damages would have been properly calculated to be $224,813.14:

| | |
|---|---:|
| Number of counterfeit units sold: | 11,426 |
| Terk's profit per unit: | $4.63 |
| Terk's profits on counterfeit sales: | $52,902.38 |
| Terk's profit from the $1.00–per–unit discount: | $11,232.00 |
| Terk's total profits | $64,134.38 |
| Trebled damages: | $192,403.14 |
| Larsen's lost TJ Maxx sales: | 7,000 |
| Profit per unit: | $4.63 |
| Larsen's damages | $32,410.00 |
| Trebled damages: | $192,403.14 |
| Larsen's damages | $32,410.00 |
| Total allowable statutory award: | $224,813.14 |

Thus, the record more than amply supports the district court's award of $217,779.78 in total damages. Equity is a consideration in awarding damages under the Lanham Act. *See* 15 U.S.C. § 1117(a); *see also Bandag*, 750 F.2d at 917 ("The goal of section 1117 is to achieve equity between or among parties."). The district court believed its award was equitable, and we affirm that award.

## IV

In summary, we affirm the district court's finding that Terk intentionally, willfully, knowingly, surreptitiously and fraudulently passed off counterfeit goods of inferior quality as Larsen's authentic Danish-made goods in violation of § 43(a) of the Lanham Act, and affirm the district court's award of $217,-779.78 in treble damages in favor of Larsen.

*AFFIRMED.*