**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1566**

CLAUDIA M. MORA, individually and as a parent, natural guardian and next friend of A.C., a minor and S.C., a minor; JUAN CARLOS CASTILLO; ADVANCE WALK-IN URGENT CARE, LLC; and UNION MULTI-CARE MEDICAL CENTER, INC.,

Plaintiff - Appellees,

and

RICHARD OSEI AKOTO, M.D., P.C., LLC; and RICHARD OSEI AKOTO, M.D.,

Plaintiffs,

v.

LANCET INDEMNITY RISK RETENTION GROUP, INC.,

Defendants - Appellants.

Appeal from the United States District Court for the District of Maryland at Greenbelt. Paula Xinis, District Judge.  (8:16-cv-00960-PX)

Argued:  January 29, 2019                           Decided:  May 7, 2019

Before MOTZ, KING, and WYNN, Circuit Judges.

Affirmed by unpublished opinion.  Judge Wynn wrote the opinion, in which Judge Motz and Judge King concurred.

**ARGUED:** John Becker Mumford, Jr., HANCOCK, DANIEL & JOHNSON, P.C., Glen Allen, Virginia, for Appellant. Matthew Peter Maloney, MALONEY LAW OFFICE, LLC, Kensington, Maryland, for Appellees. **ON BRIEF:** Kathryn E. Kasper, HANCOCK, DANIEL & JOHNSON, P.C., Glen Allen, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

In this appeal, we confront the issue of whether a medical malpractice insurer owes coverage for a default judgment obtained against an insured physician who fled the country and refused to participate in the defense of a malpractice action against him. The insurer contends that it does not owe coverage under the Policy because Maryland law prohibited it from defending the malpractice claim without the physician's consent and because his refusal to participate prejudiced the insured's ability to defend the malpractice action. The district court rejected these arguments and found the insured liable for payment under the terms of the Policy. For the reasons below, we affirm the judgment of the district court.

I.

In January 2015, Dr. Ishtiaq Malik treated Juan Castillo for his complaints of chest pains and shortness of breath. After administering a treadmill stress test and an EKG, Dr. Malik prescribed a beta blocker but did not refer Castillo to a cardiologist or instruct him to seek any other immediate medical attention. Eight days later, Castillo died from a cardiac event.

On July 2, 2015, counsel for Castillo's wife, Claudia Mora, and children notified Dr. Malik's malpractice insurer, Lancet Indemnity Risk Retention Group, Inc. ("Lancet"), that they were preparing to file a medical malpractice action against Dr. Malik. Plaintiffs indeed filed that action on July 24, 2015 in Montgomery County, Maryland state court naming as defendants: Dr. Malik, P.C.; Dr. Malik's two physician practices, Advanced Walk-In, LLC ("Advanced") and Union Multi-Care Medical Center,

3

Inc. ("Union," and collectively with Advanced and Dr. Malik, "the Insureds"); Castillo's former physician, Dr. Richard Akoto; and Dr. Richard Osei Akoto, M.D., P.C., LLC. *Mora v. Advanced Walk-In Urgent Care LLC*, No. 407276 (Montgomery Cnty. Cir. Ct. July 24, 2015). Plaintiffs alleged that Dr. Malik and Dr. Akoto negligently failed to refer Castillo to a cardiologist, leaving his condition undiagnosed and untreated, resulting in Castillo's death. That same day, Plaintiffs mailed a copy of the complaint to Lancet and Lancet's outside counsel.

In response to the letter and lawsuit, Lancet informed the Insureds that it had been contacted by the plaintiffs in the malpractice action, had retained defense counsel on the Insureds' behalf, and required Dr. Malik's assistance in discussing the allegations against the Insureds. The attorney retained by Lancet, Brad Kelly, made multiple attempts to contact Dr. Malik by phone, email, and in writing. Dr. Malik, however, never responded, despite repeated attempts to reach him over the course of many months. After speaking with one of Dr. Malik's former attorneys, Lancet learned Dr. Malik had moved to Pakistan and had no plans to return to the United States.

Unable to reach Dr. Malik, Kelly advised Lancet that because he had not obtained Dr. Malik's consent to representation, the Maryland Rules of Professional Conduct barred him from appearing in the malpractice action. After Kelly advised Lancet that he believed he was ethically barred from appearing on Dr. Malik's behalf, Lancet elected not to participate in the malpractice action—it did not investigate the malpractice claim, it did not obtain Castillo's medical records, and it did not answer Plaintiffs' complaint.

4

Several months later, in October 2015, Lancet sent a letter to Dr. Malik's last known address informing him that it was disclaiming coverage because of his failure to cooperate in defense of the malpractice suit. Lancet sent two similar letters to Pakistani addresses thought to be where Dr. Malik might be residing.

In February 2016, Plaintiffs moved for Entry of an Order of Default against the Insureds, which the state court granted on March 11, 2016. The attorney for the Plaintiffs notified Lancet that it had thirty days to move to vacate the order. Three days before a state-court scheduled hearing on damages, Lancet filed a motion to intervene—its first effort to participate in the case—which the court granted. Thereafter, Lancet unsuccessfully moved to delay the damages hearing. The state court then entered judgment in the Plaintiffs' favor in the amount of $2.56 million.

On March 2, 2016, Mora, her two minor children, and her adult son, Juan Carlos Castillo, filed the instant action in Maryland state court, seeking a declaration that Lancet owed coverage under the Policy for the judgment in the malpractice action. Lancet removed the case to federal court and filed a counterclaim seeking a declaration that the Policy was void because of Dr. Malik's failure to comply with notice and cooperation provisions in the Policy.[1]

---

[1] Following a Rule 16 pretrial conference, Mora, Lancet, and Dr. Akoto stipulated that Advanced and Union, as well as Defendants Richard Akoto, M.D. and Richard Osei Akoto, M.D., P.C., LLC, should be realigned as plaintiffs in the declaratory judgment action against Lancet.

5

Thereafter, both parties filed motions for summary judgment, which the court denied in an opinion and order entered March 1, 2017. *Mora v. Lancet Indem. Risk Retention Group, Inc.*, No. PX 16-960, 2017 WL 818718, at *1 (D. Md. Mar. 1, 2017). Applying Maryland law, the district court held that as a matter of law Lancet could not disclaim coverage based on lack of notice because it had received notice from Plaintiffs' counsel. *Id.* at *6–7. However, the court determined that there were triable issues of fact precluding summary judgment on the issue of whether, under the terms of the Policy, Lancet could disclaim coverage on grounds that it was prejudiced by Dr. Malik's absence and refusal to cooperate. *Id.* at *10.

Following a two-day bench trial on the issue of prejudice, the district court entered judgment in favor of Plaintiffs, declaring that Lancet was "liable for the money damages of its Insureds pursuant to the Policy's terms." *Mora v. Lancet Indem. Risk Retention Grp., Inc.*, 2017 WL 4618461, at *1 (D. Md. Oct. 16, 2017). Specifically, the district court found that neither ethical rules, nor Maryland law, nor the terms of the Policy prevented counsel for Lancet from entering an appearance and defending the malpractice action. *Id.* at *8. Accordingly, Lancet's decision not to participate in the malpractice action "belie[d] its argument that it was prejudiced by Dr. Malik's lack of cooperation." *Id.* Furthermore, the district court concluded that Lancet had failed to meet its burden to establish that it had been actually prejudiced by Dr. Malik's refusal to participate because, even in Dr. Malik's absence, Lancet had several viable paths to defending the malpractice action, which it elected not to pursue. *Id.* at *9–10. After a separate hearing

6

on damages, the district court awarded Plaintiffs damages in the amount of $996,840.50 as well as post-judgment interest.[2] Lancet timely appealed.

## II.

On appeal from a bench trial, this Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 145 (4th Cir. 1998).

Lancet raises four arguments. First, it contends that under the Maryland Attorneys' Rules of Professional Conduct, Maryland law, and the terms of the Policy, its counsel could not enter an appearance in the malpractice action without the consent of Dr. Malik. Second, Lancet argues that, as a matter of fact, even if it had defended the malpractice suit, it would have been prejudiced by Dr. Malik's absence and refusal to cooperate, therefore voiding coverage under the terms of the Policy. Third, Lancet argues that Dr. Malik's failure to notify Lancet of the malpractice action voided the Policy. Finally, Lancet challenges the district court's award of $996,840.50 plus post-judgment interest, arguing that the policy is subject to a $1 million limit that cannot be exceeded by post-judgment interest.

Resolution of several of these questions requires this Court to construe the Policy. Under Maryland law—which the parties agree controls this diversity case—courts should

---

[2] This amount of damages was half of the total judgment entered by the Maryland Circuit Court. A separate settlement with Dr. Akoto had reduced the amount owed by the Insureds to 50% of the Circuit Court's judgment.

7

"interpret the language of an insurance policy with the same principles and rules of construction that [are] use[d] to interpret other contracts." *Connors v. Gov't Emps. Ins. Co.*, 113 A.3d 595, 603 (Md. 2015). Courts must construe insurance policies "as a whole to determine the intention of parties." *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 393 (Md. 2006). An insurance policy should be "measured by its terms unless a statute, a regulation, or public policy is violated thereby." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985) (citations omitted).

In interpreting an insurance policy, courts must "look first to the contract language employed by the parties to determine the scope and limitations of the insurance coverage." *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000). "When interpreting the words of a contract, [courts should] seek to give the words their customary, ordinary, and accepted meaning." *Id.* (internal quotation marks omitted). Additionally, a court tasked with interpreting an insurance contract should "examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Clendenin Bros.*, 889 A.2d at 393 (internal quotation marks omitted).

Although Maryland does not follow the majority of states in construing policies strictly against the insurer, *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 619 (Md. 1995), if an insurance policy is ambiguous, "it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument*," *Megonnell v. United States Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002) (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. In. Co.*, 699 A.2d 482, 494 (Md. 1997) (emphasis in original). "A term of a contract

is ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Cole*, 753 A.2d at 537.

A.

Lancet first argues that the district court erred in relying on Lancet's failure to participate in the malpractice action in rejecting its prejudice argument. According to Lancet, the Maryland Attorneys' Rules of Professional Conduct, Maryland law, and the terms of the Policy precluded "Lancet (whether through appointed defense counsel or on its own behalf) to appear" without the consent and cooperation of Dr. Malik, meaning that Lancet should not be faulted for electing not to participate in the medical malpractice action. Appellant's Br. at 8.

Consistent with Kelly's advice, Lancet maintains that if an attorney had entered an appearance in the malpractice action without Dr. Malik's consent, the attorney would have violated two of the Maryland Rules of Professional Conduct: Rule 1.2(a), which requires counsel to "abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued," and Rule 1.8(f)(1), which provides that "[a]n attorney shall not accept compensation for representing a client from one other than the client unless . . . the client gives informed consent." But an attorney would not have violated either rule if the attorney appeared in the malpractice proceedings on behalf of Lancet and the Insureds because Section 2 of the Policy conferred on Lancet "the *right* and duty to defend any Claim covered by the Policy." J.A. 84 (emphasis added). That provision

9

also afforded Lancet the "right" to investigate any covered claims against the Insureds and the "right" to choose counsel to defend any claims asserted against the Insureds. *Id.*

Maryland courts have recognized the validity of such "advanced" consent provisions in insurance contracts, which allow defense counsel to represent both the insurer and the insured simultaneously:

> The customary clause in insurance policies requiring the insured to permit the insurer's lawyer to defend claims insured against is *consent in advance* by the insured to such dual representation and obviates an improper relationship, but if, in the course of the dual representation an actual conflict develops between the interests of the insured and those of the insurer, the lawyer must either withdraw entirely from the case or continue to represent one of the clients only.

*Fid. & Cas. Co. v. McConnaughy*, 179 A.2d 117, 121 (Md. 1962) (emphasis added).

To that end, Plaintiffs' expert in Maryland insurance defense law, Albert Brault—who has decades of experience defending medical malpractice actions in Maryland—testified that absent an advance consent provision, like Section 2 of the Policy, the insurance company would be left "totally dependent on a doctor" and unable to "control the defense itself" or to defend its own interests. J.A. 1401. Brault explained that insurers include advance consent clauses in their policies because the insurers bear the ultimate financial risk and therefore need the authority to defend the action. Brault further testified that, as a matter of practice, Maryland malpractice defense attorneys routinely receive cases directly from an insurer and begin working on the cases without waiting for additional consent from the insured.

According to Brault, even if Kelly eventually would have had to withdraw from representing the Insureds due to Dr. Malik's noncooperation, Kelly could have continued

10

to represent Lancet's interests in the suit.  Indeed, in testimony credited by the district court, Brault opined that "where the conflict arises from a failure of the insured to cooperate, the attorney *must* nonetheless vigorously defend on behalf of the insurer, and protect its potential denial of coverage by issuing a reservation of rights letter."  *Mora*, 2017 WL 4618461, at *8 (emphasis added).  Brault further testified that Lancet had the ability to "settle as to their own liability, not as to the liability that may be applicable to the individual."  J.A. 1391.

Accordingly, Kelly's contention that he lacked the ability to enter an appearance without the consent of Dr. Malik finds no support in the Policy, in Maryland law, or in the expert testimony presented to and credited by the district court.  Notably, both Brault *and Lancet's malpractice defense expert*, William Artz, agreed that Kelly could have made an appearance.  Curiously, Lancet appears not to have consulted with any other attorneys before electing not to participate in the malpractice proceedings.

Lancet nevertheless argues that the Maryland Court of Appeals' decision in *Chapman v. Kamara*, 739 A.2d 387 (Md. 1999), establishes that Kelly could not enter an appearance—and Lancet could not have participated in the action—without Dr. Malik's consent.  In *Chapman*, the court vacated a judgment against a defendant after an insurance company filed an answer on behalf of the defendant denying liability in a wrongful death claim.  *Id.* at 397.  Lancet emphasizes that, in vacating the judgment, the court noted that the client had never authorized the attorney's appearance and had never spoken to or met with the insurance company's attorney.  *Id.* at 394.

11

For several reasons, Lancet's reliance on *Chapman* is misplaced. To begin, the Court of Appeals noted that there was no evidence in the record that the insurance policy at issue included an advanced consent provision. *Id.* at 393 & n.5. Indeed, the record did not include a copy of the insurance policy at issue. *Id.* Equally significant, the Court of Appeals vacated the judgment not for absence of consent, but rather due to the plaintiff's failure to serve the defendant. *Id.* at 393–94. Here, the Insured gave advanced consent in the Policy, and there is no dispute as to the adequacy of Plaintiffs' service. Based on the advanced consent, Kelly could have entered an appearance on behalf of the Insureds and Lancet under Maryland's well-established dual representation doctrine. Accordingly, *Chapman* does not control this case.

## B.

Lancet next argues that the district court clearly erred in finding that Lancet failed to meet its burden to establish that it was prejudiced by Dr. Malik's refusal to cooperate in the defense of the malpractice claim.

"A court reviewing for clear error may not 'reverse a lower court's finding of fact simply because [it] would have decided the case differently. Rather, a reviewing court must ask whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as

12

the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985).

> Section 25 of the policy—titled "Cooperation and Assistance"—provides:
>
> The Insured must cooperate and assist the Company and the appointed defense counsel in all aspects of the investigation and defense; and shall, upon request, submit to examination and interrogation by a representative of the Company, under oath if required, attend hearings, depositions and trials, assist in effecting any settlement, securing and giving evidence, and obtaining the attendance of witnesses, all without charge to the Company.

J.A. 103. That section further provides that "[a]ny failure of the Insured to cooperate that prejudices our ability to defend any Claim, shall void this Policy." *Id.* Lancet argues that Dr. Malik's absence prejudiced it, thereby voiding the policy.

Because the term is undefined in the policy, we must decide what "prejudice" entails. The leading case defining prejudice for purposes of Maryland law states that "the proper focus should be on whether the insured's wilful conduct has, or may reasonably have, *precluded the insurer from establishing a legitimate jury issue* of the insured's liability, either liability *vel non* or for the damages awarded." *Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 767 A.2d 831, 843 (Md. 2001) (emphasis added). The insurer has the burden of proof to show prejudice. *Nat'l Union Fire Ins. Co. v. Fund for Animals*, 153 A.3d 123, 137 (Md. 2017). And although the insurer does not have to overcome "the almost insurmountable burden" of proving that the verdict was the direct *result* of a lack of cooperation, it must show that the insured's failure to cooperate "has, in a significant way, precluded or hampered it from presenting a credible defense to the claim." *Allstate*, 767 A.2d at 843. Under this standard, "possible, theoretical,

13

conjectural, or hypothetical" prejudice does not suffice. *Nat'l Union*, 153 A.3d at 136–37 (internal quotation marks omitted).

Correctly applying the definition of prejudice set forth above, the district court found that Lancet failed to meet its burden to establish prejudice. In rendering that finding, the district court first rejected Lancet's contention that it was prejudiced by Kelly's inability to enter an appearance. *See Mora*, 2017 WL 4618461, at *8. As explained above, however, the plain language of the Policy authorized counsel for Lancet to enter an appearance, *see supra* Part II.A, meaning that Lancet's errant strategic decision—not Dr. Malik's noncooperation—caused any prejudice attributable to Lancet's failure to participate in the malpractice proceeding. *Mora*, 2017 WL 4618461, at *8 ("Lancet [wa]s prejudiced by its own choice not to defend the action from the outset."). The district court reasonably found that because Lancet elected not to mount a defense, any prejudice attributable to Dr. Malik's noncooperation was "hypothetical" and therefore not a sufficient basis to void the policy. *Id.* at *10.

The district court also rejected Lancet's argument that "even if it had chosen to pursue the litigation, Dr. Malik's absence would have hamstrung Lancet on defending against Malik's violation of [the] standard of care." *Id.* at *9. In support of that finding, the district court noted that, during the trial, "Lancet vigorously pressed, through its medical expert, cardiologist Dr. Richard Schwartz, that the state of the evidence absent Malik would be insufficient to establish one way or the other whether Malik violated the standard of care." *Id.* The district court explained that "this is itself a credible defense to the Malpractice Lawsuit" because it demonstrated that, in Dr. Malik's absence, "precious

14

little" evidence was available for *Plaintiffs* to meet their burden to show "that Malik's conduct violated the standard of care." *Id.* This determination constitutes a reasonable inference from facts in the record and therefore is not subject to reversal as clearly erroneous.

The district court also found credible testimony by Plaintiffs' expert on emergency medicine, Dr. Alec Anders, that "the medical records alone provided sufficient evidence for medical experts to opine on [the] standard of care" because Dr. Malik's "contemporaneous notes reflect[ed] his diagnostic impressions, course of care, and follow-up plan." *Id.* According to Dr. Anders, such notes are not only used by other physicians administering additional treatment, but also are used by experts at trials testifying as to whether a defendant physician met the standard of care. Plaintiffs' medical malpractice defense expert, Brault, likewise testified that it would have been possible for Lancet to mount a defense that Dr. Malik's conduct met the standard of care primarily, if not exclusively, from his consultation notes:

> [An expert opinion] can be formed right from this record, what he did by examination and what he did by treatment, and that's what we need. Whatever the doctor may have been thinking makes no difference. This is what he did. And if what he did meets the standard of care, you've got a defense.

J.A. 1375–76. The district court reasonably inferred from this evidence that "record evidence was sufficient to render a standard of care opinion," *Mora*, 2017 WL 4618461, at *10—a well-supported finding not subject to reversal as clearly erroneous.

In sum, the district court's factual findings as to Lancet's failure to meet its burden to establish prejudice find ample evidentiary support in the record and are not subject to

15

reversal under the deferential standard of review that we must apply to a district court's factual findings. Accordingly, the district court did not reversibly err in finding that Lancet failed to meet its burden to establish prejudice.

C.

Next, Lancet argues that the district court erred in holding that the Policy's notice provision was satisfied by Plaintiffs' counsel—as opposed to Dr. Malik—notifying Lancet of the malpractice claim.

Section 6 of the Policy provides that "[n]otifying us of an **Occurrence** or **Claim** does not provide coverage hereunder unless it contains . . . written notice received by an **Insured**, and forwarded to us, from a person or entity, or on behalf of such person or entity by another party legally empowered to act on their behalf, alleging that such person or entity has been damaged by an **Insured**." J.A. 90 (bolded font in original). The district court concluded—and we agree—that this language is ambiguous as to whether notice by a third-party is sufficient to trigger coverage. *See Mora*, 2017 WL 818718, at *6. As the district court explained, the Policy "does not expressly state that the 'person or entity' cannot be a third party such as Plaintiff who forwarded the information to Lancet. Moreover, the provision does not say that the notice received by an insured has to be forwarded to Lancet by that insured." *Id.*

Lancet emphasizes the Policy further states that "it is a condition precedent to your rights under this policy that you give us immediate written notice thereof and provide us with all documentation comprising the claim." J.A. 90 (capitalized in original). "You" refers to the Insureds. J.A. 83. But whereas Section 6 expressly deals with "coverage,"

16

the language upon which Lancet relies renders notice a "condition precedent" to the insured's "*rights under this policy*." J.A. 90 (emphasis added). As the district court noted, "[n]owhere in the Policy is 'rights under this policy' used or explained. . . . Accordingly, 'your rights' as used may or may not encompass 'coverage hereunder.'" *Mora*, 2017 WL 818718, at *7.

The Policy, therefore, is ambiguous as to whether third-party notice is sufficient. Because ambiguities are to be resolved "against the insured as drafter of the instrument," *Megonnell*, 796 A.2d at 772, we must construe the ambiguous notice provisions against Lancet. Therefore, the notice provided by Plaintiffs' counsel satisfied the Policy.

D.

Finally, Lancet argues that the district court's award of post-judgment interest violated the terms of the Policy. The District Court awarded Plaintiffs $996,840.50 in damages. With the addition post-judgment interest, the amount of Lancet's obligation to Plaintiffs will exceed the Policy's $1 million limitation of liability. According to Lancet, awarding Plaintiffs post-judgment interest over-and-above the $1 million limit "read[s] the Policy's limits of liability out of the Policy entirely." Appellant's Br. at 29. We disagree.

In the General Terms and Conditions, the Policy states that "Defense Costs are included in the Limitations of Liability." J.A. 83. The Policy further defines "Defense Costs" as including "Interests on that part of the judgment covered by this Policy, after the entry of the judgement and before we have paid, offered to pay, or deposited in court that part of the judgment that is within our Limits of Insurance." J.A. 86.

17

However, the General Terms and Conditions also state that if any term in that section "is inconsistent or in conflict with the terms and conditions of the Coverage Section, the terms and conditions of the Coverage Section shall control." J.A. 84. And under the "Supplemental Payments" portion of the Coverage Section, the Policy provides that Lancet agrees to pay "[a]ll interest on the *full amount* of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Liability." J.A. 108 (emphasis added). Courts routinely interpret materially indistinguishable provisions in insurance contracts as requiring payment of interest in full, despite any limitation on liability. *See Wilkerson v. Md. Cas. Co.*, 119 F. Supp. 383, 388 (E.D. Va. 1953), *aff'd*, *Md. Cas. Co. v. Wilkerson*, 210 F.2d 245, 246 (4th Cir. 1954); *see also Fratus v. Republic W. Ins. Co.*, 147 F.3d 25, 28 (1st Cir. 1998) (noting that the contract terms "could not be clearer" and that "'all interest' does not mean 'partial interest'"). Notably, these courts have held that such provisions require that the insurer pay interest in full even when the award of interest would render the total payment in excess of the policy's limit. *See Fratus*, 147 F. 3d at 29.

The Policy includes conflicting language as to whether post-judgment interest that brings an award over-and-above the Policy's $1 million limit is covered. Whereas the General Terms and Conditions define post-judgment interest as a "Defense Cost" subject to the limitation of liability, the Coverage Section provides for payment of "all interest," including interest over-and-above the Policy's limit. The Policy expressly provides that in the event of any such conflict, the Coverage Section controls. Accordingly, the district

18

court did not err in awarding Plaintiffs post-judgment interest in excess of the Policy's limit.

III.

For the reasons stated above, we affirm the judgment of the district court.

*AFFIRMED*