Affirmed by published opinion. Judge LUTTIG wrote the majority opinion, in which Judge NIEMEYER joined. Judge DIANA GRIBBON MOTZ wrote the dissenting opinion.
OPINION
LUTTIG, Circuit Judge:
Plaintiff companies appeal from the district court’s summary judgment that their registration and use of forty-three domain addresses infringe a foreign corporation’s rights under the Lanham Act and violate the Anticybersquatting Act, where the foreign corporation advertised its trademark domestically, but only rendered services under it abroad. We conclude that the district court’s judgment, although not its reasoning, was correct, and therefore affirm.
I.
Appellee, Societe des Bains de Mer et du Cercle des Etrangers a Monaco (“SBM”), owns and operates historic properties in Monte Carlo, Monaco, including resort and casino facilities. One of its properties, a casino, has operated under the “Casino de Monte Carlo” trademark since 1863. The mark is registered in Monaco, but not in the United States. SBM promotes this casino, along with its other properties, around the world. For 18 years, SBM has promoted its properties from a New York office staffed with four employees. SBM’s promotions within the United States, funded with $1 million annually, include trade show participation, advertising campaigns, charity partnerships, direct mail solicitation, telephone marketing, and solicitation of media coverage.
Appellants, the plaintiff companies, are five companies formed and controlled by a French national, which operate more than 150 web sites devoted to online gambling. Included in this roster are 53 web sites whose domain addresses incorporate some portion of the term “Casino de Monte Carlo.”[1] These web sites, along with the gambling software they employ, also exhibit pictures of the Casino de Monte Carlo’s exterior and interior, contain renderings that are strikingly similar to the Casino de Monte Carlo’s interior, and make allusion to the geographic location of Monte Carlo, implying that they offer online gambling as an alternative to their Monaco-based casino, though they operate no such facility.
When SBM learned of the plaintiff companies’ web sites and their uses of the “Casino de Monte Carlo” mark, it challenged them in the World Intellectual Property Organization (WIPO). A WIPO panel ruled against the plaintiff companies and ordered the transfer of the 53 domain addresses to SBM. To escape this judgment, the plaintiff companies brought suit in federal court against SBM seeking declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that they are entitled to the disputed domain names. SBM counterclaimed under the Lanham Act (15 U.S.C. § 1111 et seq.) for trademark infringement under section 1125(a);[2] trademark dilution *362 under section 1125(c); cybersquatting under section 1125(d)(1); and unfair competition in violation of section 1126(h). The district court ruled against SBM on its section 1125(c) trademark dilution claim, because SBM had not shown actual economic harm, and on its section 1126(h) unfair competition claim. But the court ruled in favor of SBM on its trademark infringement claim and on its cybersquat-ting claim, awarding SBM $51,000 in statutory damages and transfer of 43 of the 53 contested domain addresses.[3] The plaintiff companies now appeal from that adverse judgment.
II.
Although the district court decided this case on motions for summary judgment, factual determinations underlay its ultimate ruling {e.g., findings as to likelihood of confusion and secondary meaning). The plaintiff companies contend that the court exceeded its summary judgment authority by resolving such questions of fact. Two factors present in this case justify the judicial posture taken by the court, however. First, the parties, having prepared for a bench trial, agreed to submit the voluminous record to the court for dispositive decision at the time of the summary judgment motions, see J.A. at 1002-03 (the court: “there is really no reason why the Court should not dispose of this matter on the current record; isn’t that right?” Attorney for the plaintiff companies: “I believe that’s correct, your Honor.” Attorney for SBM: “I think that sounds sensible, your Honor.” Attorney for defendant Levy: “That’s ex-actly what I would ask for, your Honor.” The court: “All right.”).
Secondly, the court’s disposition of the case was consistent with the fact that the parties did not contradict one another’s proffered facts, but only disputed the inferences that a fact finder would draw from those underlying facts. With the parties’ voluntary submission of the record, comprised of only uncontroverted proffers, before it, and being en route to a bench trial anyway, the court properly proceeded to judgment in the case. Cf. Matter of Placid Oil Co., 932 F.2d 394, 398 (5th Cir.1991) (“[I]t makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts. If a trial on the merits will not enhance the court’s ability to draw inferences and conclusions, then a district judge properly should draw his inferences without resort to the expense of trial.” (quotations and citations omitted)).
Because the court decided the case on summary judgment motions, we review its legal determinations de novo, see Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 928 (4th Cir. 1995). But since it also engaged in fact-finding to dispose of the matter, we review its findings of fact for clear error. See, e.g., Petro Stopping Centers, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 91-92 (4th Cir.1997) (“This circuit reviews district court determinations regarding likelihood of confusion under a clearly errone *363 ous standard.”); RFE Industries, Inc. v. SPM Corp., 105 F.3d 923, 925 (4th Cir. 1997) (“[The] district court’s findings [as to secondary meaning] may be disturbed on appeal only if they are clearly erroneous.”).[4]
III.
The plaintiff companies first challenge the district court’s determination that their use of 43 domain addresses violated 15 U.S.C. § 1125(a) of the Lanham Act, infringing on SBM’s trademark. Central to their challenge is the claim that SBM did not have a protectable interest in the “Casino de Monte Carlo” mark, a prerequisite to SBM’s ability to claim against the plaintiff companies under the Act. See 15 U.S.C. § 1125(a)(1) (allowing only a person “who believes that he or she is or is likely to be damaged” by the defendant’s use of a confusing mark to bring a civil action); see also Lone Star Steakhouse & Saloon, Inc., 43 F.3d at 930 (proving trademark infringement under 15 U.S.C. § 1125(a) requires a plaintiff to prove it has a protecta-ble mark).
This circuit requires that an unregistered trademark satisfy two requirements if its owner is to have a protectable interest in the trademark: The mark must be used in commerce, see 15 U.S.C. § 1051 (only trademarks “used in commerce,” or which a person has a bona fide intention to use in commerce, can be registered, signaling Lanham Act protectability); see also Larsen v. Terk Technologies Corp., 151 F.3d 140, 146 (4th Cir.1998) (“to receive protection under [1125(a)] a trademark ... must be ‘in use’ in commerce”), and it must be distinctive, see Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir.1996) (noting that the degree of protection a mark may receive is directly related to its distinctiveness). The plaintiff companies argue that the district court erred in concluding that SBM met these two requirements. We address both arguments in turn.
A.
Both parties have agreed, in their briefs and at oral argument, that the critical question in assessing whether SBM “used its mark in commerce” is whether the services SBM provided under the “Casino de Monte Carlo” mark were rendered in commerce. As shown below, the Lanham Act’s plain language makes this conclusion unavoidable and the parties’ agreement unsurprising.
We must first contend with a threshold matter, however. This circuit has never directly addressed the scope of the term “commerce” within the Lanham Act. Because of the clarity of the Act’s own definition of the term, see 15 U.S.C. § 1127 (defining “commerce” as “all commerce which may lawfully be regulated by Congress”), we now hold that “commerce” un *364 der the Act is coterminous with that commerce that Congress may regulate under the Commerce Clause of the United States Constitution. The other circuits to address this question have concluded the same. See, e.g., United We Stand America, Inc. v. United We Stand, America, NY, Inc., 128 F.3d 86, 92-93 (2nd Cir. 1997); Planetary Motion v. Techsplosion, 261 F.3d 1188, 1194 (11th Cir.2001). Of course, Article I of the Constitution provides that,
[t]he Congress shall have Power ... to regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes[.]
U.S. Const. art. I, § 8, cl. 3. Consequently, “commerce” under the Lanham Act necessarily includes all the explicitly identified variants of interstate commerce, foreign trade, and Indian commerce.
Understanding commerce under the Act to be coterminous with that commerce Congress may regulate under the Commerce Clause, we turn next to the determination of what constitutes “use in commerce” under the Act. Again we rely on section 1127, which provides, of particular relevance here, a specific definition of that term as it relates to servicemarks, which the “Casino de Monte Carlo” mark unquestionably is:
The term “use in commerce” means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be used in commerce—
(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.
15 U.S.C. § 1127 (emphasis added).
Consistent with this definition of the statutory “use in commerce” requirement, the Supreme Court has said that “[t]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.... [T]he right to a particular mark grows out of its use, not its mere adoption;” United Drug Co. v. Theodore Rectanus, Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918). Because a mark is used in commerce only if it accompanies services rendered in commerce, i.e., it is employed appurtenant to an established business or trade that is in commerce, “mere advertising” of that mark does not establish its protectability, though advertising is itself commerce that Congress may regulate.
With these principles in clear view, we proceed to address whether the “Casino de Monte Carlo” mark was used in commerce. In their briefs and before the court below, the parties debate principally whether the activities of SBM’s New York office conducted under the “Casino de Monte Carlo” mark constitute services rendered in interstate commerce. SBM, for its part, contends that the office’s booking of reservations is a rendered service, and that its maintenance of the office, its advertising in this country, and its promotional web page attach the “Casino de Monte Carlo” mark for sales and advertising purposes to this interstate service, thereby satisfying the “use in commerce” requirement. The plaintiff companies argue, to the contrary, that there is no evidence in the record that the New York office books reservations to the casino, and that, as a result, the office engages in no activity beyond “mere advertising.” They *365 argue further that the casino gambling services are the only established business to which the trademark applies, and that that service, being rendered in Monaco, is not rendered in commerce that Congress may regulate. The district court, accepting SBM’s arguments, concluded as follows:
[I]t is clear from the undisputed record that SBM’s New York office was one of SBM’s many international sales offices from which customers could book reservations. Thus, the record shows that in this respect, SBM “services are rendered” in the United States.
Int’l Bancorp v. SBM, 192 F.Supp.2d 467, 479-80 (E.D.Va.2002) [Summary Judgment ].
SBM’s argument and the district court’s reasoning are in error because the New York-office bookings on which they rely do not relate to the casino in question, but, rather, to SBM’s resort facilities. As became evident at oral argument and upon our review of the record, SBM’s assertion that the record contains evidence that its New York office booked reservations to the casino is unsubstantiated. The plaintiff companies correctly point out that since the “Casino de Monte Carlo” mark only pertains to the casino and its gambling services, any guest reservations SBM’s New York office and web site book for SBM’s various resorts, which reservation services the record does disclose, are irrelevant to the analysis. And the other operations of SBM’s New York office, at least as they appear in the record, are merely promotional in nature. The Lan-ham Act and the Supreme Court, as shown above, make clear that a mark’s protection may not be based on “mere advertising.”
Because SBM presented no record evidence that the New York office did anything other than advertise the “Casino de Monte Carlo” mark, if its case rested on this alone, the plaintiff companies would have the better of the argument. When they appeared before the court, however, we asked the parties to address themselves to the question of whether the casino services at issue were rendered in foreign trade, and the plaintiff companies conceded that the record contained evidence that United States citizens went to and gambled at the casino. This concession, when taken together with the undisputed fact that the Casino de Monte Carlo is a subject of a foreign nation, makes unavoidable the legal conclusion that foreign trade was present here, and that as such, so also was “commerce” under the Lanham Act.
Since the nineteenth century, it has been well established that the Commerce Clause reaches to foreign trade. And, for the same length of time, the Supreme Court has defined foreign trade as trade between subjects of the United States and subjects of a foreign nation. See In re: TradeMark Cases, 100 U.S. 82, 96, 25 L.Ed. 550 (1879) (“commerce with foreign nations means commerce between citizens of the United States and citizens and subjects of foreign nations”); see also Henderson v. Mayor of City of New York, 92 U.S. 259, 270, 28 L.Ed. 543 (1875) (same); United States v. Holliday, 3 Wall. 407, 70 U.S. 407, 417, 18 L.Ed. 182 (1865) (same). And, of course, commerce does not solely apply “to traffic, to buying and selling, or the interchange of commodities ... Commerce, undoubtedly, is traffic, but it is something more: it is [commercial] intercourse.” Gibbons v. Ogden, 9 Wheat. 1, 22 U.S. 1, 189, 6 L.Ed. 23 (1824) (C.J.Marshall). Service transactions are clearly commercial intercourse, and by extension can clearly constitute foreign trade. Cf United States v. American Building Maintenance Indus., 422 U.S. 271, 283, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975) (noting *366 that an entity engages in commerce when it is “directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce”) (emphasis added). Thus, while SBM’s promotions within the United States do not on their own constitute a use in commerce of the “Casino de Monte Carlo” mark, the mark is nonetheless used in commerce because United States citizens purchase casino services sold by a subject of a foreign nation, which purchases constitute trade with a foreign nation that Congress may regulate under the Commerce Clause. And SBM’s promotions “use[ ] or display! ] [the mark] in the sale or advertising of [these] services ... rendered in commerce.”
At oral argument, the plaintiff companies objected to this straight-forward reasoning. They argued first that any trade that United States citizens engaged in at the casino was not subject to regulation by Congress since it did not occur in the United States.
COURT: Commerce [ie., commerce within Congress’ regulatory ambit, and thus equally commerce under the Lan-ham Act] includes services with a foreign country doesn’t it?
Appellant: Not unless they’re rendered in the United States.
COURT: Unless the Supreme Court has held otherwise?
Appellant: Unless the Supreme Court has held otherwise, of course.
Oral Argument, Dec. 8, 2002. In the alternative, they argued that even if Congress could regulate transactions between United States citizens and foreign subjects that occur abroad, the particular transactions at issue here should not be considered foreign trade because the Casino de Monte Carlo was a “playground for the very, very rich,” id., and thus did not have a substantial effect on foreign trade. Both arguments are unavailing.
The plaintiff companies’ first argument fails because the locality in which foreign commercial intercourse occurs is of no concern to Congress’ power under the Constitution to regulate such commerce. In United States v. Holliday, when examining the extent of Congress’ authority over Indian commerce, the Supreme Court noted that under Gibbons v. Ogden the foreign commerce power “must be exercised wherever the subject exists.... The locality of the traffic can have nothing to do with the power.” Holliday, 70 U.S. at 417-18, 70 U.S. 407 (emphasis added). The subject of foreign trade, as the Supreme Court noted in In re: Trade-Mark Cases, Henderson, and Holliday, is defined not by where the trade occurs, but by the characteristics of the parties who engage in the trade, just as the Holliday Court concluded that the subject of Indian commerce is defined not by whether the commerce occurs on Indian territory, but rather by whether the trade brings United States citizens and tribal Indians together as transacting partners. See also United States v. Mazurie, 419 U.S. 544, 554, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) (“This Court has repeatedly held that [the Indian commerce clause] affords Congress the power to prohibit or regulate the sale of alcoholic beverages to tribal Indians, wherever situated ...” (emphasis added)).
Thus it is that Congress has validly enacted laws such as the Trading With the Enemy Act (TWEA), Act of Oct. 6, 1917, ch. 106, 40 Stat. 411, and the International Emergency Economic Powers Act (IEE-PA), title II, Pub.L. 95-228, 91 Stat. 1626 et seq., codified at 50 U.S.C. § 1701 et seq., under its authority to regulate foreign commerce and has provided, via those enactments, for the regulation of commercial intercourse between United States citizens and subjects of foreign nations, see, e.g., United States v. Yoshida International, *367 Inc., 63 C.C.P.A. 15, 526 F.2d 560 (1975) (upholding broad import surcharge on products imported by United States citizens in transactions with Japanese sellers, which regulation was issued by the executive under TWEA’s delegation of foreign commerce authority). And more importantly here, thus it is also that these laws extend their regulations to reach commercial intercourse that occurs solely on the foreign sovereign’s soil. See, e.g., 31 C.F.R. § 515.560(a)(3) (1977) (prohibiting United States citizens from purchasing merchandise in Cuba with a foreign market value in excess of $100). Such embargo authority, encompassing embargoes of commercial intercourse abroad by United States citizens with subjects of foreign nations, has long been recognized to be a valid exercise of Congress’ foreign commerce clause power:
It has, we believe, been universally admitted, that [the foreign commerce clause] comprehend[s] every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend.
Gibbons v. Ogden, 22 U.S. at 193-94.
Congress are, by the Constitution, vested with the power to regulate commerce with foreign nations; and however, at periods of high excitement, an application of the terms “to regulate commerce” such as would embrace absolute prohibition may have been questioned, yet, since the passage of the embargo and non-intercourse laws, and the repeated judicial sanctions those statutes have received, it can scarcely, at this day, be open to doubt, that every subject falling within the legitimate sphere of commercial regulation may be partially or wholly excluded ... Such exclusion cannot be limited to particular classes or descriptions of commercial subjects; it may embrace manufactures, bullion, coin, or any other thing. The power once conceded, it may operate on any and every subject of commerce to which the legislative direction may apply it.
United States v. Mangold, 50 U.S. 560, 566-67, 9 How. 560, 13 L.Ed. 257 (1850). The Supreme Court’s acceptance of this expansive authority confirms that Congress may regulate foreign trade wherever it occurs.
Nor, in modern times, has the Supreme Court ever suggested that Congress’ authority over foreign trade is limited in the manner that the plaintiff companies suggest. To the contrary, when it has considered the scope of Congress’ authority over foreign trade, the Court has emphasized the expansive nature of that authority. See, e.g., Pfizer, Inc. v. India, 434 U.S. 308, 313 n. 11, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978) (“The Chief Justice’s dissent seems to contend that the Sherman Act’s reference to commerce with foreign nations was intended only to reach conspiracies affecting goods imported into this county. But the scope of congressional power over foreign commerce has never been so limited ...” (citations omitted)).
Congress’ interest in foreign trade and the Executive’s interest in foreign affairs unavoidably intersect, and this intersection can give the mistaken impression that Congress’ authority over foreign trade must be limited so as to accommodate the President’s authority over foreign affairs. The first interest, that of foreign trade, the Constitution assigns entirely to the legislative authority of Congress. See U.S. Const. art. I, § 8, cl. 3. The second, that of foreign affairs, it assigns jointly to the political branches (i.e., Congress and the Executive). See U.S. Const. art. I, § 8, cl. 1 and 11; id. art. II, § 2. The intersection of these two interests, and the dual *368 allocation of authority over the latter, has long been noted:
If our government should make [restrictions on foreign commerce] the subject of a treaty, there could be no doubt that such a treaty would fall within the power conferred on the President and the Senate by the Constitution. [Foreign commerce] is in fact, in an eminent degree, a subject which concerns our international relations, in regard to which foreign nations ought to be considered and their rights respected, whether the rule be established by treaty or by legislation.
Henderson, 92 U.S. at 273. But no precedent suggests that the intersecting foreign affairs power the Constitution vests in the Executive in any way curtails the foreign trade power the Constitution vests in Congress, and there is thus no rationale for limiting the scope of congressional authority in the realm of foreign commerce to commercial intercourse that occurs solely within the United States.[5]
The plaintiff companies’ second argument, that the purchase of gambling services by United States citizens at the Casino de Monte Carlo is not commerce because it does not have a substantial effect on the foreign commerce of the United States, also fails. The substantial effects test is not implicated here at all.
The Supreme Court has articulated the substantial effects test to ensure that Congress does not exceed its constitutional authority to regulate interstate commerce by enacting legislation that, rather than regulating interstate commerce, trammels on the rights of states to regulate purely intra-state activity for themselves pursuant to their police power. See United States v. Morrison, 529 U.S. 598, 608-09, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). But while “Congress’ power to regulate interstate commerce may be restricted by considerations of federalism and state sovereignty[,][i]t has never been suggested that Congress’ power to regulate foreign commerce could be so limited.” Japan Line Ltd. v. Los Angeles County, 441 U.S. 434, 448 n. 13, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979).
Although the Constitution, Art. I, § 8, cl. 3, grants Congress the power to regulate commerce “with foreign Nations” and “among the several States” in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater.
Id. at 448, 99 S.Ct. 1813. The rationale that underlies application of the substantial effects test in the analysis of congressional legislation purporting to regulate interstate commerce is therefore absent from analysis of congressional legislation purporting to regulate foreign commerce.
Furthermore, the substantial effects test only limits Congress’ authoritative reach with respect to one of the three broad categories of activity that Congress may regulate under the Commerce Clause.
First, Congress may regulate the use of the channels of interstate commerce.... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce_ Finally, Con *369 gress’ commerce authority includes the power to regulate ... those activities that substantially affect interstate commerce.
Morrison, 529 U.S. at 609, 120 S.Ct. 1740 (emphasis added). Consequently, the substantial effects test does not limit Congress’ regulation of activity that is itself commercial intercourse occurring interstate; it governs only Congress’ regulation of non-commercial intercourse activity that effects interstate commerce.
Here, the regulated activity at issue is itself commercial intercourse (ie., the trademarks are an instrumentality of commercial intercourse and the provision of the services necessarily involves both channels of and instrumentalities of that commercial intercourse). And the regulated commercial intercourse involves transactions between United States citizens and the subject of a foreign nation, qualifying the intercourse as a literal example of foreign trade. Even were the substantial effects test to govern some instances of congressional regulation of foreign trade, the present case, because it involves only the first two “broad categories of activity that Congress may regulate under its commerce power,” id. at 608, 120 S.Ct. 1740, and not the third, does not implicate the substantial effects test.[6]
The plaintiff companies, seeking to avoid the full import of this foreign trade analysis, ask us to be wary in addressing whether United States trademark protection can extend to services rendered abroad and suggest that other courts have decided this question in the negative with reasoning that should persuade us not to extend trademark protection in this instance. In particular, the plaintiff companies point to the Second Circuit’s opinion in Buti v. Perosa, S.R.L., 139 F.3d 98 (2nd Cir.1998). In Buti, the Second Circuit decided that the ad hoc distribution in the United States of an Italian restaurant’s t-shirts, key chains, and cards, by the owner of the restaurant who was also the owner of a modeling agency, to his colleagues in the modeling industry, did not establish that the mark was used in commerce.
Buti is not persuasive authority to us for several reasons, however. First, the Buti court did not analyze the application of the Lanham Act to foreign trade because, as it noted, the plaintiff, in a “pivotal concession! ], ... conceded at oral argument that ... the food and drink services [it sells] form no part of the trade between Italy and the United States.” Id. at 103. And in fact, even though the Buti court did not analyze trademark rights created via foreign trade, it did acknowledge the basis for such. See id. (noting that a key inquiry is “whether [the plaintiffl has conducted the affairs of its Milan Fashion Cafe in such a way as to ‘substantially affect’ United States interstate or foreign commerce, and thereby fall within Congress’ authority under the Commerce Clause”). Secondly, even had the Buti plaintiff not explicitly conceded that his business was not foreign trade, it is not clear that the facts before the Buti court would have established that the plaintiff used the mark in that putative foreign trade. As the Second Circuit carefully noted, the restaurant undertook no “formal advertising or public relations *370 campaign [aimed at United States citizens].” Id. at 100.
Here, SBM does not concede that its services do not constitute foreign trade when United States citizens purchase them. Instead, the plaintiff companies concede the very elements we conclude constitute foreign trade. And quite clearly SBM has used the mark in its foreign trade, formally, and at great cost, advertising its services intentionally to United States citizens under the “Casino de Monte Carlo” mark. Because SBM used its mark in the sale and advertising of its gambling services to United States citizens; because its rendering of gambling services to United States citizens constitutes foreign trade; because foreign trade is commerce Congress may lawfully regulate; and because commerce under the Lanham Act comprises all commerce that Congress may lawfully regulate, the services SBM renders under the “Casino de Monte Carlo” mark to citizens of the United States are services rendered in commerce, and the “use in commerce” requirement that the Lanham Act sets forth for the mark’s protectability is satisfied.
B.
The use of an unregistered mark in foreign trade does not in any way assure its owner that the mark will merit Lanham Act protection; it only makes such protection possible. For an unregistered mark that is used in foreign trade to merit Lanham Act protection, that mark must be distinctive among United States consumers. The plaintiff companies argue that even if the “Casino de Monte Carlo” mark is used in commerce, it is not distinctive because it is merely geographically descriptive, and that since it is not distinctive, it is not protectable.
Though the plaintiff companies correctly argue that the mark is geographically descriptive (ie., it geographically describes where the casino is located and nothing more), this objection does not foreclose the mark’s distinctiveness. Descriptive marks will be deemed distinctive if they achieve secondary meaning. See Perini Corp. v. Perini Construction, Inc., 915 F.2d 121, 125 (4th Cir.1990) (“Secondary meaning is the consuming public’s understanding that the mark, when used in context, refers, not to what the descriptive mark ordinarily describes, but to the particular business that the mark is meant to identify.” (emphasis added)). Thus, the relevant question here is whether the district court correctly found that the mark possessed secondary meaning.
The district court employed two distinct analyses to assess the secondary meaning of “Casino de Monte Carlo.” The court engaged in traditional Perini analysis, examining a variety of factors — the Perini factors — that we have said are relevant in assessing secondary meaning. Though proof of secondary meaning is a “vigorous evidentiary requirement! ],” see id., plaintiffs can meet their burden by offering proof including, though not limited to, 1) advertising expenditures; 2) consumer studies linking the mark to a source; 3) sales success; 4) unsolicited media coverage of the product; 5) attempts to plagiarize the mark; and 6) the length and exclusivity of the mark’s use. See id.
The district court, finding that SBM provided proof of substantial advertising expenditures; significant sales success within the United States; substantial unsolicited media coverage of the casino; frequent attempts by others to plagiarize the mark; and a long history of continuous, if not exclusive, use of the mark; concluded that SBM had met its burden. Summary Judgment, 192 F.Supp.2d at 481-82. Upon our review of the record, we con- *371 elude that the court’s conclusion as to these points is not clear error.
Furthermore, the district court noted that under our precedent in Larsen v. Terk Technologies, 151 F.3d 140, 148-49 (4th Cir.1998), SBM met its burden of proving secondary meaning, irrespective of the Perini test, because it had established that the plaintiff companies directly and intentionally copied the “Casino de Monte Carlo” mark. See Summary Judgment, 192 F.Supp.2d at 481 (“the record leaves no doubt that the plaintiff companies intentionally and directly copied SBM’s mark”). Under Larsen, a trademark plaintiff that proves that the defendant directly and intentionally copied its mark is presumed to have proved that mark’s secondary meaning, and the defendant must then disprove that presumption. We decided Larsen on the logic of two prior cases, Osem Food Industries Ltd. v. Sherwood Foods, Inc., 917 F.2d 161 (4th Cir. 1990), and M. Kramer Mfg. Co., Inc. v. Andrews, 783 F.2d 421 (4th Cir.1986), which established that a person who directly and intentionally copies another’s trade dress has the burden of refuting a presumption that the trade dress has secondary meaning.
The plaintiff companies argue that applying the presumption to trademarks, as Larsen does, as opposed to trade dress, as Osem and M. Kramer do, is unsupported by policy, violates Fed.R.Evid. 301, and has been rejected by other circuits. None of this, however, diminishes the prece-dential force that Larsen has on this case. And since the plaintiff companies did not present evidence sufficient to rebut the Larsen presumption, let alone to counter the Perini factors discussed above, the district court’s conclusion that the “Casino de Monte Carlo” mark is distinctive, see Summary Judgment, 192 F.Supp.2d at 482, must be affirmed.
The dissent contends that the district court did not engage in two distinct analy-ses of secondary meaning, but rather applied the Larsen presumption, and then improperly shifted the burden of proof to the plaintiff companies, in effect requiring them, unfairly, to “prove that SBM’s mark did not have secondary meaning. The district court did not so merge the analyses, and though it intertwined its two analyses, such was only natural since it was in the posture of the fact finder, and not simply addressing questions of law.
The district court’s conclusion that the Larsen presumption applied placed a rebuttal burden on the plaintiff companies. That is, if SBM had offered no proof of secondary meaning whatsoever, SBM would still be due a finding that its mark enjoyed secondary meaning unless the plaintiff companies proffered some evidence, not ultimately persuasive evidence, just some evidence, that the fact finder concluded was probative in disproving secondary meaning. Here, upon looking at the relevant evidence presented by the plaintiff companies, which as one would expect the court did through the lens of the traditional Perini categories, the district court found that none of that evidence was probative, at any level.
In addition, having evaluated the evidence and found that none of it successfully rebutted the Larsen presumption, the court also noted that SBM’s evidence, when evaluated in the applicable Perini categories resulted in findings sufficient to establish secondary meaning. Thus, the court said,
In sum, far from rebutting the [Larsen ] presumption of distinctiveness that operates here, the Perini factors, when applied to the facts of this case, actually support that presumption.
*372 Summary Judgment, 192 F.Supp.2d at 482 (emphasis added).
That the dissent, had it been the fact finder, might have drawn different inferences from the evidence, and so concluded that the Larsen presumption was rebutted, is irrelevant here. The district court was the fact finder, charged with drawing inferences from the evidence; it was that court’s responsibility (as it would have been the jury’s responsibility had the parties instead opted for a jury trial) to determine whether or not the plaintiff companies’ presented any evidence that rebutted the Larsen presumption. The district court quite simply found that none of the evidence presented by the plaintiff companies was probative of a lack of secondary meaning, and on that finding alone, it could have concluded that SBM met the secondary meaning requirement. That the court went on to note that even under the Perini analysis SBM met its burden does not transform its analysis into one that requires the plaintiff companies to carry the ultimate burden.
C.
Because the district court properly concluded, though for the wrong reasons, that the “Casino de Monte Carlo” mark was used in commerce, and because its conclusion that the mark had secondary meaning was not clearly erroneous, the court’s determination that the mark was protectable was proper, and it did not err by proceeding to assess whether the plaintiff companies’ use of the mark constituted trademark infringement.
D.
The dissent’s disagreement with this part of our holding today is based on (1) a conflation of the two critical elements of the “use in commerce” inquiry, see post at 383-384 (“The majority reaches the unprecedented conclusion that an entity’s use of its foreign trademarks solely to sell services in a foreign country entitles it to trademark protection under United States law, even though the foreign mark owner has never used or registered its mark in the United States.”); (2) two cases decided by the Trademark Trial and Appellate Board (“TTAB”), which cases, like the dissent here, conflate the distinct elements of the two-pronged “use in commerce” requirement, see post at 386-387, 387-388 (citing to Mother’s Restaurants, Inc. v. Mother’s Other Kitchen, Inc., 1983 WL 51992, 218 U.S.P.Q. 1046 (TTAB 1983), and to Linville v. Rivard, 1996 WL 795315, 41 U.S.P.Q.2d 1731 (TTAB 1997) (“Linville II ”)); and (3) policy arguments. See post at 389. With these grounds as its justification for deciding the matter differently, the dissent labels our application of the straightforward statutory command of the Lanham Act as one that “threatens to wreak havoc over our country’s trademark law and would have a stifling effect on United States commercial interests generally,” see post at 389. We address the dissent’s bases for its disagreement seria-tim.
But, before we address the dissent’s reasoning, we note, we think importantly, that:
(1) The dissent does not disagree with the court’s conclusion that the text of the Lanham Act extends protection to marks that meet the statutory requirements for being “used in commerce,” provided they also enjoy secondary meaning;
(2) The dissent does not disagree with the court’s conclusion that the “use in commerce” requirement entails two distinct elements: a service being rendered in commerce, and a mark for that service being used or displayed in the sale or advertising of that service.
*373 (3) The dissent does not disagree with the conclusion that “commerce” under the Lanham Act is coterminous with commerce that Congress may regulate;
(4) The dissent does not disagree with the court’s conclusion that the commerce at issue, the selling by SBM of gambling services to United States citizens abroad, constitutes foreign commerce under Article I of the United States Constitution and so also constitutes commerce under the Lanham Act; and
(5) The dissent does not disagree with the court’s conclusion that SBM did intentionally and formally use and display its mark in the sale and advertising of its services in the United States to United States citizens in an effort to spur sales of its services to them.
We believe that these conclusions alone justify our holding that SBM’s mark would merit Lanham Act protection (provided the mark also enjoyed secondary meaning), and absent the dissent’s disagreement on these points, we do not understand the statutory basis for its disagreement.
As to the dissent’s failings, as we imagine them, first the dissent conflates the two distinct aspects of the statutory “use in commerce” requirement. The distinct elements of the analysis are set out above. See supra p. 364. But in short, section 1127 defines the term “use in commerce” with respect to services as being when a mark is “used or displayed in the sale or advertising of services and the services are rendered in commerce.” As a consequence of the conjunctive command, it is not enough for a mark owner simply to render services in foreign commerce for it to be eligible for trademark protection. Nor is it enough for a mark owner simply to use or display a mark in the sale or advertising of services to United States consumers. Both elements are required, and both elements must be distinctly analyzed.
Though the dissent contends that it understands there are two distinct elements to the use in commerce requirement, see post at 383-384, its opinion betrays its claim. It must necessarily conflate the two elements to conclude, as it does, that today we hold “the protection of United States trademark law extends to a mark used exclusively in Monaco,” post at 383, for it readily admits that only one of the two elements of use occurred abroad, the rendering of services, and that the other element, SBM’s New York City-based brand-building efforts, did indeed occur in the United States.
This case presents a record replete with demonstrations of SBM’s singularly impressive commitment to building brand identity in the United States. These efforts constitute, as we explain above, see supra p. 373, a “use or display in the sale or advertising” of the services that we elsewhere determined were also rendered in commerce. It cannot but be concluded that this use of the mark — that is the building of brand identity among United States consumers — -very much occurred in the United States, and indisputably so.
On our understanding of the statutory language it does not follow that since the mark has not been rendered in commerce in the United States it is equally fair to say that the mark has not been used in the United States, when in fact it has been widely used in the United States for advertising and marketing purposes. Unless one conflates these two elements then, one cannot fairly criticize our holding today as protecting a mark “exclusively” used in Moncaco. At most one can criticize us for providing protection to a mark used in both Monaco and the United States.
The dissent’s different understanding of the statute and of the two elements it sets *374 out for establishing “use in commerce” is that both elements of “use in commerce” must occur within the geographic borders of the United States, a merging of the contents of the two elements that is not provided for by the statute. The dissent believes it can defend this proposition on the basis that many courts over the years have said that “use” must occur in the United States in order for a mark to merit Lanham Act protection. But, a “use in commerce” whose elements occur, as here, both in the United States and abroad is not exclusive foreign use, and is not controlled by the principles of law upon which the dissent relies. Indeed, that the statute’s definition of the term commerce encompasses foreign commerce (thus naturally including some services rendered outside the United States borders) points, in fact, in the opposite direction from the dissent’s conclusion.
Yet we reject the dissent’s interpretation of “use” not only because the statute does not suggest it, but also because the authorities to which the dissent cites for its rule that “[bjoth elements must occur in the United States in order to satisfy the use in commerce requirement” do not yield the precise formulation that the dissent suggests they do. While these cases support the general contention that “use” must be in the United States, they do not support the very different conclusion that both distinct elements of the statutory “use in commerce” definition for servicemarks must occur within the United States. Rather, these authorities, employing the term “use” in loose and often varying ways, have either not drawn the distinction between the two elements of use that are required in the statutory analysis of ser-vicemarks, or have drawn the distinction but then have not stated that both elements of a servicemark’s use must occur within the geographic confines of the United States.
Indeed, of the many cases the dissent cites, only two provide the support it seeks. Both of those cases decided by the TTAB, Mother’s Restaurants, Inc. and Linville II, are unpersuasive authority to us because of their failure properly to distinguish analytically between the two distinct elements of the “use in commerce” requirement, and between the distinct content of those elements. But before we reject the reasoning of those two cases, we first owe the dissent a run-down on the other cases it presents as contrary precedent to our decision today.
The dissent suggests that the Federal Circuit opposes our rule. In particular, it points to Person’s Co. Ltd. v. Christman, 900 F.2d 1565 (Fed.Cir.1990). In Person’s, however, the court faced the question of whether a Japanese manufacturer of clothes that had sold its clothes in Japan, and had never used or displayed its mark to advertise or sell its products in the United States, could establish priority of use in the mark based on its Japanese operations. Though the record did disclose a single occurrence when a United States citizen purchased goods in Japan from the company, thus arguably meeting the commerce requirement, no evidence whatsoever was proffered that the company had in any way used or displayed its mark to advertise or sell its product to United States consumers. Thus it was that only “foreign use” (i.e., the foreign advertising of its product to foreign consumers) of the mark existed.[7] Of course, *375 the court’s rejection of such foreign use in no way reflects upon the case before us today where SBM did use and display its mark to advertise or sell its services in the United States to United States consumers.[8]
The dissent also points to Imperial Tobacco Limited v. Philip Morris, Inc., 899 F.2d 1575 (Fed.Cir.1990), as its justification. But, just a glance at the first paragraph in the first section of that opinion tips off the careful reader that that court too understood that varied forms of commerce could support trademark protection:
No use of the mark in commerce in or with the United States was alleged.
Id. at 1577 (emphasis added). By this factual notation, the court made clear, albeit by implication, that commerce in the United States is not the only commerce that can satisfy the Act, but that commerce with the United States is also implicated.
The analysis that follows then confirms that the court was not there crafting a rule requiring both elements of “use in commerce” to occur in the United States. The court faced a claim by a United Kingdom mark owner that it had not abandoned its mark’s United States registration (obtained under the Lanham Act’s provision allowing registration of foreign marks employed exclusively in foreign use). The mark owner claimed that either its intent to employ the mark in exclusively United States use (i.e., its claimed intent to sell goods in the United States to United States citizens), or its existent exclusively foreign use (ie., its selling and advertising of goods to foreigners in foreign lands) could satisfy the Act’s ongoing use in commerce requirement. Faced with these two claimed uses, the court said, “the terms ‘use’ and ‘nonuse’ mean use and nonuse in the United States[,]” id. at 1579, thus holding that the exclusively foreign use the mark owner relied on could not satisfy the Act, and proceeding only to inquire whether the claimed intent to employ the mark in exclusively domestic use had been established.
Imperial Tobacco’s “use in the United States” principle, then, presents a distinction between two particular types of uses: one exclusively domestic, one exclusively foreign. And, just as with Person’s, the *376 “use” (exclusively foreign) that Imperial Tobacco determined can-not support protection is different from the use at issue here, where the mark is both used in advertising and displays in the United States and attached to services rendered in qualifying commerce overseas.
The dissent also argues that the appeal of the TTAB’s decision in Linville II, Rivard v. Linville, 133 F.3d 1446 (Fed.Cir. 1998) (Rivard II), qualifies as relevant Federal Circuit precedent on this issue. However, such is not the case. The circuit court’s holding in that case, however, can only be understood after explication of the case’s procedural history.
First, the TTAB, in Linville v. Rivard, 26 U.S.P.Q.2d 1508, 1993 WL 156480 (TTAB 1993) (Linville I), addressed a petition to cancel a mark owner’s registration on summary judgment. As in Imperial Tobacco, the mark owner acquired Lanham Act registration by relying on the Act’s provision for registration of foreign marks. The mark owner was Canadian and used the mark on his Canadian beauty salons. He also engaged in some advertising to United States consumers, and had some United States clientele. The Board concluded that these facts did not constitute use in commerce because the alleged qualifying commerce at issue (selling to United States consumers) was not qualifying commerce.
On appeal to the Federal Circuit, the court, in an unpublished decision, agreed with the Board’s conclusion that use in commerce had not been established, but not on the basis of the Board’s decision, and in fact without any consideration of whether selling to United States consumers constituted qualifying commerce, or whether use in commerce was established when such was combined with a use in United States advertising. Instead, assuming that exclusively Canadian use was at issue, the court relied entirely on its holding from Imperial Tobacco. See Rivard v. Linville, 11 F.3d 1074, 1993 WL 472795 at 2 (Rivard I). That the court never considered the mark owner’s claim that his servicing of United States consumers and his United States advertising constituted use in commerce is made apparent by the fact that the court nowhere mentions those facts.
Despite agreeing with the Board’s ultimate disposition of the use in commerce question, the court vacated and remanded the Board’s decision on other grounds. On remand, in Linville II, the Board reiterated its exact Linville I holding as to the use in commerce issue. That is, it again concluded that the sale of services to United States consumers was not qualifying commerce.
Following Linville II appeal was again taken, and Rivard II, the case on which the dissent relies, resulted. In that decision, the circuit court affirmed the judgment of the Board as to the use in commerce question, but again, not on the Board’s reasoning and without any consideration of whether servicing United States consumers constituted qualifying commerce. Instead, the court omitted the relevant facts (again) and solely relied on its prior unpublished opinion.[9] Thus, the Federal Circuit in Rivard II only reiterated its holding from Rivard I (unpublished) and thus likewise only reiterated the principle from Imperial Tobacco, which principle, as we demonstrate above, is inapplicable to the case before us today.
The dissent would also rely on Fifth Circuit precedent to overcome our reasoning. That decision, Fuji Photo Film Co., Inc. v. Shinohara, 754 F.2d 591 (5th Cir. *377 1985), has no bearing here for the same reasons as we rejected Person’s. Fuji involved two Japanese companies, formed in 1919 and 1934, respectively. Both manufactured and sold products within Japan. Beginning in 1967 and 1954, respectively, the two companies sold their products in the United States. The Fuji court said that the companies’ Japan operations— that is, their manufacturing and selling products to Japanese locals as they had been doing for generations — did not figure into the trademark analysis. Just as in Person’s, such foreign use (i.e., non-qualifying commerce and the foreign use and display of the mark to advertise and sell products to foreign consumers) is not what is before us today.
The dissent would also have it that we are now in conflict with the Second Circuit on this issue as well. For the reasons given above, we reject the dissent’s contentions as to Buti. See supra pp. 369-370. But so, too, do we reject the dissent’s claim that La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265 (2nd Cir.1974), bears on this case. In that case, the court faced a trademark claim by a foreign perfume manufacturer against a domestic perfume manufacturer. The plaintiff initially asked the court to rule that it had United States trademark rights in its mark, which it had attached to products it manufactured abroad, had advertised abroad to foreigners, and had sold abroad to foreigners. The court found that such foreign use (i.e., again, non-qualifying commerce and foreign use and display of the mark to advertise and sell the product to foreign consumers) could not create trademark rights in the plaintiff. Again, such foreign use is not what is at issue today.[10]
Closer to home, the dissent suggests that a Fourth Circuit case on trade dress, CBS, Inc. v. Logical Games, 719 F.2d 1237 (4th Cir.1983), though not controlling, ought provide parallel reasoning by which we should abide. Not only does that case not support the dissent’s position, but explicit language within .it in fact points toward our decision today. That case involved a trademark infringement suit by the distributor of Rubik’s Cube, against a former distributor of the product who sold his copied version under the trademark, Magic Cube. The court rejected the defendant’s claim that, based on the third-party manufacturer’s foreign production of and foreign sale to foreign consumers of the product, he somehow was due trade dress rights in the product, accruing at the time that he imported the product into the United States. Such foreign use by the third-party, foreign manufacturer could not lead to trade dress rights, the court said. Id. at 1239. Again, such “foreign use” is not what is at stake here.
Perhaps more illuminating from the CBS decision is the following language the dissent chooses not to highlight, which language seems in fact to portend something akin to the very case before us today: *378 [F]actual situations can be imagined in which extensive — especially reiterated— purchase abroad and marketing in the United States might operate to create in the American importer trade dress rights in the United States for a format employed elsewhere by the foreign manufacturer.

Id.

The dissent would also rely on a long-line of decisions from the TTAB, to which, the dissent says, proper deference would result in our adoption of its suggested disposition. However, as noted above, only two of the cases cited are on point. The remainder are inapposite for much the same reason as the circuit court cases discussed above are inapposite.[11]
Thus we are left with only two TTAB cases remaining from those proposed by the dissent that actually bear on the issue before us today. We recognize that those *379 cases, Rivard and Mother’s Restaurants, Inc., are due “great weight” from us. See post at 386. But great weight certainly does not mean obeisance, and it does not even mean deference, particularly in the face of overwhelmingly clear statutory language that leads us to a contrary conclusion. And that there is no other precedent to support these two decisions by the TTAB simply confirms all the more our decision to reject its reasoning.
In Linville II, the Board considered whether a Canadian beauty salon that solely operated Canadian facilities, engaged in certain Canadian advertising that reached across the border into the United States, had distributed promotional materials at a single county fair in the United States, and had at times serviced United States customers, had “used” its mark under the terms of the Lanham Act. See Linville II, 41 U.S.P.Q.2d at 1735-36. Faced with these facts, the Board concluded that qualifying commerce was not present, and so denied the mark any protection. In its opinion, the Board reincorporated its initial analysis in Linville I. See Linville II, 41 U.S.P.Q.2d at 1736 (“For the reasons set forth by the Board in the summary judgment decision, we find that the above activities neither individually nor collectively constituted use of the ULTRACUTS mark in commerce[.]”).[12]
The Linville I opinion moves seamlessly between its rejection of the presence of qualifying commerce, to a rejection of “use” of the mark based on that lack of qualifying commerce, thus conflating the two inquiries and giving its opinion the superficial appearance of having rejected a claim similar to that at issue here.
We reject respondent’s argument that, through its advertising, he has used the mark ULTRACUTS in the United States continuously since 1986. Although the definition of use in commerce in the statute refers to a mark being “used or displayed in the sale or advertising of services,” the definition continues with the requirement that [:“]the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services!”] Respondent also argues that his services are rendered in commerce because of the effect on commerce which is created by his business, i.e., customers must travel from the United States to Canada in order to obtain his services, and therefore the customers travel in commerce.... [The cases respondent cites] in support of his position ... involved services which were actually rendered in the United States, i.e., a restaurant located in Ten *380 nessee and a hotel in New York which attracted interstate travelers. Those fact situations were manifestly different from that presented here, where during the relevant time period respondent’s hair salons were located only in Canada.
The mere fact that residents of the United States have availed themselves of respondent’s services while in Canada does not constitute technical trademark use of respondent’s service mark which is sufficient to obtain or maintain a registration in the United States.
26 U.S.P.Q.2d at 1512 (emphasis added).
Having determined that no qualifying commerce was present, the Board did not reject a position similar to that present here. And regardless of whether we approve or disapprove of the Board’s Commerce Clause analysis, it is readily apparent that their holding, rejecting trademark protection where no qualifying commerce is present, comports with ours.
In Mother’s Restaurants, the Board considered whether a Canadian restaurant that engaged in “advertising and promotional efforts directed to Americans entering Canada from the United States along tourist routes,” had, by that advertising, created Lanham Act rights under that mark. The Board, relying fully on a decision of the District Court for the Western District of New York, said:
[W]e decline to hold that opposer’s promotional activities in Canada regarding “MOTHER’S” and “MOTHER’S PIZZA PARLOUR & SPAGHETTI HOUSE” prior to 1976 resulted in superior rights in said marks in the United States so as to preclude applicant from registering a confusingly similar mark. Rather, it is our view that prior use and advertising of a mark in connection with goods and services marketed in a foreign country (whether said advertising occurs inside or outside the United States) creates no priority rights in said mark in the United States as against one who, in good faith, has adopted the same or similar mark for the same or similar goods or services in the United States prior to foreigner’s first use of the mark on goods or services sold and/or offered in the United States ..., at least unless it can be shown that the foreign party’s mark was, at the time of the adoption and first use of a similar mark by the first user in the United States, a “famous” mark[.]
Id. at 1048.
We are unpersuaded that this concluso-ry determination should govern our analysis. Most importantly, the Board never addressed the question of whether commerce that Congress could regulate was at issue. While it appears that such was the case from the factual description provided, the Board suggests that the only relevant question was whether “promotional activities in Canada” could create a right in a mark. By this formulation of the Lanham Act standard, the Board seems, like the dissent, to conflate the “commerce” element of the “use in commerce” requirement with the “use or display of the mark” element of that same requirement.
The conflation becomes most apparent in the Board’s next declaration that such Canadian (or even it says, United States) promotions attached to Canadian trade “create! ] no priority rights in said mark in the United States.” Id. It thus appears that the Board, while first measuring the mark owner’s “use” of the mark by promotional activity, then measures it by whether it is attached to interstate commerce, never pausing to inquire as to the subtleties of the qualifying commerce requirement. Compare id. (“[W]e decline to hold that opposer’s promotional activities in Canada ... resulted in superior *381 rights[.]”), with id. (“[A]dvertising of a mark[, wherever occurring,] in connection with goods and services marketed in a foreign country ... creates no priority rights in said mark in the United States [•]”).
In contrast, the proper inquiry in such circumstances is to evaluate first whether the commerce to which both parties claim their mark is attached may be regulated by Congress, and then to evaluate at what point in time the mark owners’ began to use or display the mark in the advertising and sale of those qualifying services to the qualifying consumers. Our disagreement with the Board’s analytical approach in Mother’s Restaurants convinces us that our circuit’s law will be better served if we hew to the language of the statute and apply the Lanham Act with a careful eye toward, and an appreciation of, the two distinct elements of the “use in commerce” requirement.
Indeed, that it is not enough for a mark owner to engage in qualifying commerce to create rights in his mark, and that it is not enough for a mark owner to use or display the mark in the advertising or sale of services to create rights in his mark, is critical. This point cannot be missed else the holding we reach today will indeed be distorted, as the dissent’s misreading of it illustrates.[13] Rather, a mark owner must both engage in qualifying commerce and use or display its mark in the sale or advertising of these services to the consumers that engage in that qualifying commerce. Of course, such was not found by the circuit courts or the Board to be the case in any of the decisions the dissent cites. While Rivard and Mother’s Restaurants may have presented such facts, the Board in Rivard explicitly disclaimed that foreign commerce was present, and in Mother’s Restaurants it did not inquire into these distinct elements so that we could even say with confidence that there the two distinct elements of the “use in commerce” requirement were, or were not, in fact met.
As to the dissent’s last principal basis for its objection to our holding today, it is one of policy. The dissent fears that we are undoing all of the good of our country’s trademark laws. See post at 388-389. We do concede that policy is not our forte. But, we cannot help but note that since avoidance of consumer confusion is the ultimate end of all trademark law, this case presents a paradigmatic situation in which we may see our laws working, as intended, to reduce consumer confusion.
Indeed, the very fact that the Board in Mother’s Restaurants would acknowledge that foreign trademarks deemed “famous” can, with neither a demonstrated connection to qualifying commerce nor a demonstrated use or display of the mark in order to advertise or sell services in such qualifying commerce, enjoy Lanham Act protection, see Mother’s Restaurants, 1983 WL 51992, 218 U.S.P.Q. at 1048, illustrates the very real interest that our trademark laws have in minimizing consumer confusion, so that our economy may enjoy the greatest possible of efficiencies and confirms that *382 trademarks developed overseas can themselves lead to such undesirable and inefficient consumer confusion here at home.
Ultimately, though, if SBM’s mark merits protection under the statute, we must provide it to them.[14] We do not know that this is “reverse imperialism,” see post at 389, but we do know that the law requires that we permit mark owners like SBM to petition our courts for protection. And we know as well that if such owners, upon their petition, can demonstrate that they meet the requirements of the statute, that they are then entitled to protection, and that it is beyond us to refuse it to them.
IV.
Having determined that the district court properly ruled that SBM’s mark was protectable under the Lanham Act, we turn next to review its conclusion that its mark was infringed by the plaintiff companies’ activity.
To prove infringement of a protectible trademark, a trademark owner must demonstrate that the infringer’s use of the mark is likely to cause consumer confusion. See Lone Star Steakhouse & Saloon, Inc., 43 F.3d at 930. On the record before us we cannot conclude that the district court committed clear error in determining that the plaintiff companies’ use of the mark would cause consumer confusion. The domain addresses in question, their use of pictures and renderings of the actual Casino de Monte Carlo, and the web sites implying that they provided online gambling as an alternative to their nonexistent Monte Carlo-based casino all support the conclusion that ordinary consumers would be confused. The district court’s grant of summary judgment to SBM for trademark infringement under § 1125(a) was therefore justified.
V.
The plaintiff companies lastly argue that the district court’s injunctive remedy, ordering transfer of 43 domain names to SBM, was over-broad and vague, and that less burdensome remedies were available. But the injunctive order was proper under § 1125(d)(1), the anticybersquatting provision that the court concluded the plaintiff companies had violated, since that provision expressly provides domain name transfer as remedy. The plaintiff companies do not challenge the district court’s determination under § 1125(d)(1), other than by their objection that the “Casino de Monte Carlo” mark is not protectable, which contention we reject above. In light of SBM’s protectable interest in the mark, and the plaintiff companies’ failure to challenge the judgment under § 1125(d)(1) on other grounds, we conclude that the court’s provision of injunctive remedy was proper.

CONCLUSION

For the reasons provided herein, the judgment of the district court is affirmed.

AFFIRMED

. E.g., casinodemontecarlo.com, casinode-montecarlo.net, casinomontecarlo.com, casi-nomontecarlo.net, casinomontecarlo.org, and casinomontecarlo.net.

. SBM actually styled its section 1125(a) counterclaim as an unfair competition suit. See J.A. at 64. The district court, although recognizing it as such at the outset of its *362 opinion, treated the counterclaim throughout as a trademark infringement claim. Because the tests for trademark infringement and unfair competition under section 1125(a) are identical, we adopt the district court's usage and refer to this claim as a trademark infringement claim.

. SBM also alleged Virginia common law trademark infringement, but the district court deemed it unnecessary to address this claim because federal law provided adequate relief.

. Though the dissent initially notes the two bases on which we conclude that the district court properly decided this case upon the submission of the record, it only takes issue with the first, that the parties intended their submission to allow the court to reach dispositive judgment. See post at 394-396. Yet, the strength of our second rationale is only made more clear by the dissent’s own analysis.
In discussing the factual findings the district court made, the dissent says repeatedly that "a fact-finder could well infer” differently. See post at 398. But, of course, that misses the whole point. The court, by the agreement of the parties (who agreed to a bench trial), was the fact finder. And all of the factual issues decided, were issues resolved by inference of the fact finder from undisputed facts. With no dispute as to the facts present, it was not improper for the court, here the fact finder, to make its findings at this point in the proceedings.

. United States courts may lack jurisdiction under which to enforce legislation Congress promulgates concerning trade that occurs on foreign soil between United States citizens and foreign subjects, particularly against those foreign subjects, but this inability to secure jurisdictional authority creates only a practical shortcoming with such legislation, making it perhaps less effective a manner to regulate foreign trade than treaty or convention. Though "in the case of foreign commerce the national government might act through a treaty,” Bob-Lo Excursion Co. v. Michigan, 333 U.S. 28, 42, 68 S.Ct. 358, 92 L.Ed. 455 (1948) (Douglas, J., dissenting), Congress’ authority under Article I of the Constitution remains whole and undiminished.

. Insofar as the plaintiff companies are instead relying on their "substantial effects” argument not to challenge the determination that the activity at issue constitutes foreign trade, but to challenge the court’s exercise of jurisdiction over them with regards to their extraterritorial conduct, see Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952), their objection fails. Both they and SBM submitted to the federal court's exercise of in personam jurisdiction over them. They cannot now challenge its exercise of such.

. As will quickly be seen in the analysis that follows, courts have long loosely used the term "foreign use.” Sometimes the term signals that the commerce at issue does not qualify as commerce that Congress may regulate, and that thus there is only “foreign use.” Sometimes the term signals that, though qualifying commerce is present, the mark owner *375 has not used or displayed the mark in advertising and sales efforts directed at United States consumers, and thus that there is only "foreign use.” And sometimes, the term signals that neither qualifying commerce, nor qualifying use or display in advertising or sales, is present, and thus that there is only "foreign use.”
Of equal importance, the Lanham Act provides different statutory definitions of use for marks attached to goods and services. Thus, the term "use” when used in the context of a case involving goods bears one meaning, and, when used in the context of a case involving services, bears another.
To the extent that this prior imprecision underlies the dissent's reasoning, its approach to the question is somewhat understandable. However, after today, such imprecision can no longer, in this circuit, cause improper decision of these difficult cases.

. The dissent suggests that our distinguishing of Person must be wrong because application of our rule to the facts of the Person case would result in a different outcome than the Federal Circuit reached in that case. See post at 390. That is not correct. The statutory provision we apply today is directed solely and specifically to services and to evaluating what constitutes use in commerce for service-marks. We would not apply our interpretation of the statutory provisions addressing services to a case involving goods. We only examine Person, and the other cases we address that involve goods instead of services, in order to demonstrate that the dissent's importation of language about "foreign use” from those cases into the case at bar does not result, when applied within the services construct, to the absurd results that the dissent suggests it would.

. "Linville established a prima facie case that Rivard abandoned the ULTRACUTS mark because he did not use it in connection with hair dressing and beauty salon services in the United States during the relevant time period. 31 U.S.P.Q.2d at 1220.” 133 F.3d at 1449.

. The dissent would also have it that The Morningside Group Limited v. Morningside Capital Group, LLC, 182 F.3d 133 (2nd Cir. 1999), supports its position. However, that case did not involve anything like the case before us. It involved services provided in the United States, and so the court distinguished it from Buti with the language the dissent cites. We wholeheartedly agree with the principle enunciated by that court in its distinguishing of Buti, particularly with its statement of the governing principal: "Mere advertising and promotion of a mark in this country are not enough to constitute 'use' of the mark 'in commerce,' so as to bring the activity within the scope of the Lanham Act.” The whole point, of course, is that with respect to services, further inquiry must be made as to whether such use (advertising and promotion in the United States) is conjoined with qualifying commerce. Thus, ultimately in Momingside Group, the court did provide the mark owner with Lanham Act protection.

. In Techex, Ltd. v. Dvorkovitz, 220 U.S.P.Q. 81 (1983), the Board considered whether a British company that "resells the equipment [it purchases from an American company] to its European customers and provides warranty services to them,” and that only intentionally advertises to those European consumers, had United States trademarks rights sis a result of that "foreign use.” The board said no. Once more, a different foreign use was at issue than is at issue today.
In Stagecoach Properties, Inc. v. Wells Fargo & Co., 199 U.S.P.Q. 341 (1978), the Board considered whether a domestic company that owned a mark, but had not at all used it to advertise or identify resorts it operated in Mexico, had Lanham Act trademark rights in that mark as a result of the fact that its resorts engaged in qualifying foreign commerce. The Board, wisely we think, said no. In reaching its decision it said, "There is [] no evidence to show that the Colorado company used a design of a stagecoach, in any form, as a sign or mark to identify its Services at [its Mexican resorts].” Id. at 349 (emphasis added). Thus, the Board rejected the contention that the mark was used or displayed in the advertising or sale of those services to United States consumers. The Board did go on in the next sentence as follows: "In addition, applicant’s argument ignores the fundamental rule that activity outside of the United States is ineffective to create rights in marks in the United States.” But we do not think that this latter statement can be understood, as the dissent would have it, to be a considered holding that where a United States firm sells its foreign resort services to United States consumers and advertises its services to those United States consumers under the mark, that such a mark would merit no Lanham Act protection. Yet, this is indeed the result to which the dissent's reasoning tends. Given the immediately pre-ceding sentence, we read this language to say simply what all the other courts in the cases we have been reviewing thus far have said: that "foreign use” of marks as so understood (that is as foreign sale and/or foreign marketing to foreigners) does not establish Lanham Act protection.
In Oland’s Breweries v. Miller Brewing Co., 189 U.S.P.Q. 481 (1976), the Board dealt with a case in which it explicitly found there was no foreign commerce (i.e., that commerce that Congress may regulate). See id. at 488 (“[T]he record shows that opposer has not sold any beer under the mark ‘SCHOONER’ in commerce which may lawfully be regulated by Congress[.]”). Based on this lacking ingredient to Lanham Act protection, the Board found that the mark had been abandoned. Then, and only then, did the Board inquire as to whether advertising the mark owner had done in the United States was evidence of an intent not to abandon the mark. Thus, it is not a case, as the dissent would have it, where the presence of foreign commerce, and associated United States-based advertising was not sufficient to justify trademark protection. Instead, the mark was abandoned because there was simply no commerce at all.
Lastly, in Sterling Drug, Inc. v. Knoll A.G. Chemische Fabriken, 159 U.S.P.Q. 628 (1968), the Board considered whether a German pharmaceutical manufacturer had Lanham Act rights to its mark in the United States where the manufacturer had not advertised in the United States or to United States consumers, though some United States consumers had been treated with the pharmaceutical in Germany. Again, the obvious element that is missing here is the use and display of the mark to advertise or sell the product to United States consumers engaging in qualifying *379 foreign commerce. See id. at 630 ("Though German publications containing applicant's advertisements of 'TALUSIN' or references to that mark were received in the United States, there is no indication in the record that these publications obtained such circulation in the United States as to make the relevant public for applicant’s goods, physicians and pharmacists, aware of applicant’s use of ‘TALUSIN.’ In other words, the advertising in a foreign publication which may occasionally be found in some library in the United States does not create protectable rights in the advertised mark in the United States.” (emphasis added)). That the Board would in this case, as in so many others, note that such "foreign use" (i.e., here, the foreign marketing to foreign consumers) is not sufficient to establish Lan-ham Act rights is entirely unobjectionable in our eyes, and again deals with different "foreign use” than that which is at issue here.

. The Board in Linville II proceeded to reiterate nearly verbatim its reasoning from Lin-ville I. We analyze the language from Linville I on which the Board relies, though the same conclusions apply to its duplicative reasoning in Linville II.

. See post at 384 (“The majority determines that [SBM’s casino] services 'constitute trade with a foreign nation that Congress may regulate under the Commerce Clause.' ” Based on this determination, "the majority accords SBM, the holder of the foreign mark, 'Casino de Monte Carlo,’ eligibility for trademark protection[.]”). Of course, that SBM’s service are qualifying commerce did not terminate our analysis of whether SBM had used its mark in commerce. The second step was to adjudge whether SBM’s massive advertising campaign in the United States, directed to United States consumers and intended to spur the qualifying commerce that is in question, constituted a use or display of the mark in the advertising of SBM's qualifying services.

. The dissent also implies that since SBM could register its mark in the United States, we should not be overly concerned with providing them the right of Lanham Act protection we today provide them. See post at 386-387. That fact is, in our minds, as irrelevant here as it would be in a case involving a domestic manufacturer who, having sold products in interstate commerce under an unregistered mark, sought the protection of the Lanham Act from an infringer.
It is inconceivable that courts would interpret the Lanham Act to punish such mark owners for failing to register their mark where their mark otherwise meets the statutory requirements for protection. Here, as much, it is inconceivable that SBM's registration status should affect our analysis of whether or not its mark qualifies for protection under the plain text of the statute.